5 Cal.Rptr.3d 42 (2003)
112 Cal.App.4th 198
Patricia HENLEY, Plaintiff and Respondent,
v.
PHILIP MORRIS INC., Defendant and Appellant.
No. A086991.
Court of Appeal, First District, Division Four.
September 25, 2003.
Review Granted December 23, 2003.
*49 Shook, Hardy & Bacon, Gerald V. Barron, Lucy E. Mason, San Francisco, Mordecai Dempsey Boone, Heller Ehrman White & McAuliffe, M. Laurence Popofsky, Curtis M. Caton, David B. Goodwin, San Francisco, Wayne Stephen Braveman, Nina A.M. Greeley, Arnold & Porter, Ronald C. Redcay, Murray R. Garnick, Robert A. McCarter, for Appellant.
Law Offices of Daniel U. Smith, Daniel Upham Smith, Ted W. Pelletier, Wartnick, Chaber, Harowitz, Smith & Tigerman, Harry F. Wartnick, Madelyn Joyce Chaber, San Francisco, for Respondent.
SEPULVEDA, J.
Plaintiff brought this action for personal injuries allegedly sustained as a result of defendant's tortious misconduct in the *50 manufacture and marketing of cigarettes. The jury returned a special verdict awarding plaintiff $1.5 million in compensatory damages and $50 million in punitive damages. The trial court denied defendant's motions for new trial and judgment notwithstanding the verdict, except that it ordered a new trial on punitive damages unless plaintiff consented to reduce the punitive award to $25 million. Plaintiff consented to the reduction, and defendant filed a timely appeal.
In our original opinion we affirmed the judgment in its entirety. (Henley v. Philip Morris (2001) 93 Cal.App.4th 824, 113 Cal.Rptr.2d 494, review granted Jan. 29, 2002, S102941 (Henley I).) The Supreme Court granted review and ultimately re-transferred the matter to us with directions to "vacate [our] decision and to reconsider the cause in light of Myers v. Philip Morris Companies, Inc. (2002) 28 Cal.4th 828, 123 Cal.Rptr.2d 40, 50 P.3d 751 [ (Myers) ], and Naegele v. R.J. Reynolds Tobacco Co. (2002) 28 Cal.4th 856, 123 Cal.Rptr.2d 61, 50 P.3d 769 [ (Naegele) ]." We concluded that many of defendant's objections, including its claims of error under those cases, had not been preserved for appeal. (See pt. I., below.)
Defendant again petitioned the California Supreme Court, which has again remanded the matter for reconsideration, now in light of State Farm Mut. Auto. Ins. Co. v. Campbell (2003) 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (Campbell). In that case the United States Supreme Court elaborated considerably upon the federal constitutional principles constraining civil punitive damage awards. We conclude that in light of that decision, the $25 million in punitive damages awarded in this matter cannot be sustained on the present record, but that an award of $9 million would satisfy the constitutional standards enunciated in that case. Accordingly we will reverse for a new trial on punitive damages unless plaintiff agrees to a reduction of the judgment to reflect such smaller award. In all other respects we reiterate our previous decision.

INTRODUCTION AND BACKGROUND
We begin with a fundamental principle overlooked by defendant: "A judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 349, p. 394.) Thus in ascertaining the underlying facts for purposes of appellate analysis, the reviewing court "must consider the evidence in the light most favorable to the prevailing party, giving him the benefit of every reasonable inference, and resolving conflicts in support of the judgment." (Id. at § 359, p. 408, italics in original.)
Viewed most favorably to the judgment, the evidence shows that plaintiff, who was born in 1946, began smoking cigarettes in 1961 or 1962, at the age of 15, when she "lit up" with some school friends outside a dance. At that time she felt smoking was "cool" and "grown up," provided the pleasure of the forbidden, made her look older, and served as a "rite of passage." Then and for some years thereafter, nobody told her that cigarettes could cause her serious disease. There were no warnings on cigarette packages or in advertisements. Plaintiff was not taught in school about the dangers of tobacco. As a result she believed that cigarettes, which contained "[t]obacco, pure and simple," were "not a harmful product." Nor did she know that cigarettes or nicotine could be addicting. *51 Nothing in the advertising she saw suggested that if she started smoking she might be unable to stop.
The jury could also find that starting no later than December 1953, defendant and other cigarette manufacturers agreed to act together to counter mounting scientific evidence about the health risks of cigarette smoking. By the time plaintiff began smoking, defendant knew that tobacco contained numerous carcinogenic substances as well as flavoring additives that also produced carcinogenic compounds upon combustion. Tobacco manufacturers were also aware of epidemiological studies that showed a strong correlation between smoking and the incidence of lung cancer. Yet they launched a concerted public relations campaign to deny any link between smoking and serious illness. A major part of this strategy was the creation of a "research institute" that would, as the public was told, attempt to find the truth about smoking and health-though in fact it was permitted to conduct very little research that might confirm a link, serving mainly, as the jury was entitled to find, to gather ammunition against tobacco's detractors. Other strategies included manipulating the mass media to suppress or make light of adverse news developments, such as new studies or reports.
The jury could also find that defendant engaged in saturation advertising, much of it consciously targeting the teenage audience from which new ("replacement") smokers had to come. Defendant knew that persons who did not begin smoking during their teen years were unlikely to do so. In particular, defendant sold the brand of cigarette plaintiff preferred, Marlboro, using symbols of the independence, autonomy, and mature strength for which teenagers were understood to yearn. The jury could find that these targeted teenage consumers possessed less critical judgment, and were more receptive to marketing manipulation generally, than might be the case with adults. The jury could find that teenagers who went past the experimentation phase became addicted to tobacco, as a result of which they found it extremely difficult to stop smoking and often suffered impaired judgment with respect to the consequences of continuing to do so.[1] The jury could find that the strategy of marketing to teenagers and causing them to become addicted to its products was central to the tremendous success and profitability of the Marlboro brand in particular, helping defendant to become one of the largest and most successful corporations in the world.
In 1966, as evidence of health risks mounted, Congress required that cigarette packages bear the relatively mild warning that smoking "may be hazardous." In 1969, Congress required a somewhat stronger warning and required that it appear in advertising as well as on packages. At the same time, Congress explicitly preempted any state law imposing a "requirement or prohibition with respect to advertising or promotion" of cigarettes language that has since been construed to preempt many but not all common-law tort claims. Although the warnings have since been further strengthened, this partial federal immunity remains in place, and is one of defendant's major defenses here. (See pt. II., below.)
In 1988 the tobacco industry acquired a safe harbor under California law when, riding the coattails of a legislative compromise, *52 tobacco was listed among "common consumer products" in former section 1714.45, a statute construed the following year to create an almost complete "immunity" from tort liability.[2] The Legislature repealed that protection effective January 1, 1998, but defendant contended below that it nonetheless applied to bar most or all of plaintiffs claims. (See pt. I., below.)
The jury would have been entitled to find that well before these legislative defenses became applicable, plaintiff had become an addicted smoker with sharply impaired judgment and will where cigarettes were concerned. Plaintiff testified that on the subject of cigarette smoking and health, "my brain wasn't going to register anything that anybody said." When she saw the first package warnings, she minimized the perceived "degree[] of danger," thinking to herself that it was also "dangerous to walk across the street." She testified that while she heard the United States Surgeon General was saying things about cigarettes, she also knew "that the tobacco companies were saying different." As a result, the package warning "didn't faze me one way or the other. I wasn't going to give the cigarettes up at that point."
Plaintiffs first regular brand of cigarettes was Marlboro, and it remained her favorite brand throughout almost all of her 35-year smoking history. From age 15 until she was about 43 years old (around 1989), she apparently smoked one-and-a-half to two packs a day of "Marlboro Red," a brand rated to deliver relatively high amounts of tar and nicotine. At that age, however, she switched to Marlboro Lights, a lower-tar brand, on what the jury was entitled to view as the direct advice of a Philip Morris agent. Plaintiff testified that around that time she began to hear that "low-tar cigarettes were better. You wouldn't get as much tar and nicotine and, you know, their advertising on the low-tar cigarettes was really out there. [¶] I'm thinking, "Well, okay. Maybe there's something to this.' So when I was approximately 43, I decided that, `Well, I'll check into this and maybe I'll change from the Reds to the Lights.' [¶] So I did indeed call the Marlboro, Philip Morris company and expressed, you know, my concerns as to, `Is it really true? Is there less tar in this or less nicotine?' [¶] And I was assured at the time that if I was concerned that, yes, I could switch to the Lights...." She did so and, in a few weeks, had more or less doubled her intake, to three-and-a-half packs a day.
By mid-October 1997 plaintiff "was feeling really bad" and "down for the count with what I thought was heavy-duty flu." She was diagnosed in February 1998 with small-cell carcinoma of the lung. The jury was more than entitled to find that this affliction was directly caused by cigarette smoking.

ANALYSIS

I.

"IMMUNITY" UNDER FORMER SECTION 1714.45

A Substantive Background.

As in effect from 1988 through the end of 1997, former section 1714.45 granted tobacco manufacturers "immunity" from most claims for personal injury caused by their products.[3] By amendments effective *53 January 1, 1998, the Legislature repealed that protection. In Myers the Supreme Court held that the repeal was "not retroactive," but was "prospective only." (Myers, supra, 28 Cal.4th 828, 847, 123 Cal.Rptr.2d 40, 50 P.3d 751; see Naegele, supra, 28 Cal.4th 856, 861, 123 Cal.Rptr.2d 61, 50 P.3d 769.) Specifically, the repeal did not operate to impose liability for conduct that was protected by the statute when it occurred. However, the repeal "removed the protection that the Immunity Statute gave to tobacco companies for their conduct occurring before [former section 1714.45's] effective date." (Myers, supra, at p. 847, 123 Cal.Rptr.2d 40, 50 P.3d 751, italics omitted.) The net result is that the former statute "continues to shield defendant tobacco companies in product liability actions but only for conduct they engaged in during the 10-year period when the Immunity Statute was in effect. The liability of tobacco companies based on their conduct outside the 10-year period of immunity is governed by general tort principles." (Id. at p. 848, 123 Cal.Rptr.2d 40, 50 P.3d 751, italics omitted; see Naegele, supra, 28 Cal.4th at p. 867, 123 Cal. Rptr.2d 61, 50 P.3d 769.)
In Naegele the court considered the scope of the protection afforded by the former statute for conduct while it was in effect. It summarized its conclusions as follows: "[T]he Immunity Statute bars plaintiffs claims, however labeled, where they allege no more than personal injury caused by dangers or risks inherent in the consumption of tobacco products such as cigarettes. But the Immunity Statute does not bar plaintiffs claims that the defendants adulterated the cigarettes plaintiff smoked with additives that exposed him to dangers not inherent in cigarette smoking. Nor does the Immunity Statute shield tobacco companies from liability for conduct outside the immunity period." (Naegele, supra, 28 Cal.4th at p. 867,123 Cal.Rptr.2d 61, 50 P.3d 769.)

B. Preservation of Issues for Appeal.
In our original opinion we held that defendant had not preserved any contention that former section 1714.45 afforded anything less than a complete defense. We noted that defendant had only asserted the statute in the trial court as a basis for a nonsuit or directed verdict, i.e., as a complete defense to plaintiffs entire action, except her claim for breach of express warranty, which was expressly exempted by the statute itself.[4] We wrote that the trial court's denial of the motion for nonsuit or directed verdict was the only "specific and reviewable ruling" before us. (Henley I, typed opn. at p. 6.) We held that defendant had failed to preserve various other claims of error suggested in its briefs.[5] We noted this failure again *54 when we later addressed defendant's argument that the abolition of the former immunity would offend the prohibition against ex post facto laws. We reasoned that this argument could at most operate to preclude the imposition of punitive damages based on conduct that was immunized when it occurred. We held that, as so understood, the ex post facto argument had not been preserved for appeal.[6] We concluded that the trial court did not err in denying defendant's motions for nonsuit and directed verdict because the repeal of former section 1714.45 permitted plaintiff to pursue her claims at least in part. Since defendant had not asserted any more limited defense based on the former statute, we did not reach the question whether some such limited defense might exist.
In Myers and Naegele the Supreme Court held that the repeal of former section 1714.45 left intact a time-limited immunity that precludes consideration, in support of most theories of liability, of a tobacco manufacturer's conduct while the former statute was in effect, i.e., from January 1, 1988 through December 31, 1997. At the same time, the court confirmed our own prior conclusion that the former statute no longer affords a complete defense where, as here, the plaintiffs injuries are attributable to tortious conduct both within and without the immunity period. As applicable here, the rule of Myers/Naegele means that, upon request, defendant would have been entitled to prevent the jury from considering its conduct during the immunity period in support of punitive damages or in support of most theories of compensatory damages. However the rule of those cases does not affect our previous conclusion that the trial court correctly denied defendant's motions for nonsuit or directed verdict.
The question now before us is whether defendant has preserved any claim of error predicated on the time-limited immunity afforded under Myers/Naegele. Although our prior opinion may be understood to answer this question in the negative, we have revisited the issue de novo in light of the Supreme Court's vacation of that opinion. After reviewing the parties' supplemental briefs and the applicable principles of appellate procedure, we have once again concluded that defendant has failed to preserve for appeal any claim of a partial defense under former section 1714.45, including the time-limited immunity conferred by Myers/Naegele.

C. Failure to Raise Point Below.
Defendant's basic complaint under Myers/Naegele is that the jury was permitted *55 to consider conduct during the immunity period in support of plaintiffs claims for both compensatory and punitive damages. At its core this is a contention concerning the lack of relevancy, or limited relevancy, of such evidence. Yet at no time prior to the verdict did defendant so much as hint to the trial court that section 1714.45 might operate to restrict the admissibility of such evidence or the purposes for which it could be considered by the jury. Defendant could have raised such a point by several means, including motion in limine, contemporaneous objection to evidence (with request for admonition if the evidence was admissible for a limited purpose), motion to strike (if the evidence came in before an objection could be lodged), and appropriate instructions at the end of trial. Defendant invoked none of these remedies or devices. Instead defendant cited section 1714.45 solely as the basis for an all-or-nothing defense, and sat mute while plaintiff introduced, and the jury heard and considered, evidence of conduct during the immunity period.
The record discloses no explanation for this conduct. It does not suggest, for example, that defendant was compelled to forego a more limited application of former section 1714.45 in order to raise the statute as a complete bar. On the contrary, it appears that defendant was entirely free to assert both positions in the alternative, i.e., that the former statute continued to afford a complete defense but, failing that, rendered conduct during the immunity period inadmissible or admissible only for limited purposes.
Ordinarily the failure to raise a legal theory by appropriate objection or motion in the trial court precludes consideration of that theory on appeal. (Vikco Ins. Services, Inc. v. Ohio Indemnity Co. (1999) 70 Cal.App.4th 55, 66-67, 82 Cal. Rptr.2d 442 ["As a general rule, issues or theories not properly raised or presented before the trial court will not be considered on appeal."]; see 9 Witkin, Cal. Procedure, supra, § 394, p. 444.) This rule may not bar consideration of at least some objections that are deemed "jurisdictional." (See 9 Witkin, Cal. Procedure, supra, § 398 at p. 450 [rule does not bar consideration of "[a] noncurable defect of substance where the question is one of law, such as lack of jurisdiction"]; see Vikco Ins. Services, Inc. v. Ohio Indemnity Co., supra, 70 Cal.App.4th at p. 67, 82 Cal. Rptr.2d 442 [court would exercise its discretion to consider "a jurisdictional issue of first impression"].) However, at oral argument counsel for defendant disclaimed any contention that the claimed error here is jurisdictional in this sense. He contended that the cognizability of the point is affected by the heightened judicial oversight employed with respect to punitive damage awards, but no authority has been cited to or found by us suggesting that otherwise noncognizable error in the admission of evidence or instructions concerning it can be raised on appeal without a predicate objection in the trial court. (Cf. Adams v. Murakami (1991) 54 Cal.3d 105, 109-110, 115 fn. 5, 284 Cal.Rptr. 318, 813 P.2d 1348 [failure to require evidence of defendant's financial condition cognizable on appeal despite absence of predicate objection because absence of such evidence thwarts effective appellate oversight of award]; Tomaselli v. Transamerica Ins. Co. (1994) 25 Cal.App.4th 1269, 1283-1286, 31 Cal.Rptr.2d 433 [to same effect].)
We turn to the question whether defendant has brought itself within any other exception to the rule generally barring points on appeal that were not raised by appropriate objection in the trial court.

D. Newly Decided Point of Law.
We first consider whether defendant is excused from the requirement of a *56 predicate trial court objection because the authority on which it now relies was only decided after trial. Defendant contends that its failure to raise the concept of an immunity window in the trial court is "excusable as a matter of law given that, at the time of trial, the proper scope of immunity was unsettled." The implication is that whenever a previously unsettled issue of law is authoritatively resolved after trial, a party benefiting from the new rule may assert it on appeal whether or not any relief consistent with that rule was requested in the trial court.
Such a proposition is not borne out by the cases. Although courts may choose to consider a new point on appeal where it rests on newly decided authority, this exception does not properly apply unless it appears that the new rule could not fairly be anticipated at the first trial, or its assertion would have been futile because it conflicted with then-governing law.[7]
Defendant quotes the broad statement in In re Marriage of Moschetta (1994) 25 Cal.App.4th 1218, 1227, 30 Cal.Rptr.2d 893 (Moschetta), that "a court will consider on appeal a new point of law decided while the appeal is pending." Read in context, however, that statement is entirely consistent with the qualifications we have just noted. The Moschetta court went on to quote, and apply in this context, Witkin's statement of the parallel exception to the rule against changing one's "theory of trial" on appeal: "`A court may refuse to follow the doctrine [of not hearing new arguments on appeal] where, after trial, there is a change in judicially declared law which validates a theory that would have been rejected if presented under the case law as it existed at the time of trial. [Citation.]'" (Moschetta, supra, 25 Cal. App.4th at p. 1227, fn. 12, 30 Cal.Rptr.2d 893, italics added, bracketed material in original; see now 9 Witkin, Cal. Procedure, supra, § 406, at p. 457; Marsango v. Automobile Club of So. Cal. (1969) 1 Cal. App.3d 688, 694, 82 Cal.Rptr. 92.)
Moreover the newly raised issue in Moschettathe enforceability of surrogate parent contractswas "a matter of intense public and legal concern." (Moschetta, supra, 25 Cal.App.4th at pp. 1227-1228, 30 Cal.Rptr.2d 893.) In addition, the court's consideration of the point did not necessitate a retrial because the court rejected the newly asserted objection on the merits. *57 (Id. at p. 1231, 30 Cal.Rptr.2d 893.) As the court noted, "One of the reasons parties are not normally allowed to raise new issues on appeal is that it is unfair to their opponents who did not have the opportunity to attack that theory factually or legally in the trial court, and to the trial court itself, which may be required to retry issues that might have been handled more efficiently the first time around." (Id. at p. 1227, 30 Cal.Rptr.2d 893.) The latter danger was obviated in Moschetta by the fact that the new point lacked merit and reversal was not required. Here, in contrast, the successful assertion of the newly asserted objections would necessitate a new trial.
A similar factor distinguishes the second case cited by defendant, in which the court relied on newly available authority to direct entry of judgment for the appellant. (Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co. (1996) 47 Cal.App.4th 464, 493, 54 Cal.Rptr.2d 888; see Claremont Imp. Club v. Buckingham, (1948) 89 Cal.App.2d 32, 33, 200 P.2d 47 [judgment upholding racially restrictive covenant reversed based on intervening holding that such covenants are judicially unenforceable; had intervening decision been rendered before trial, "judgment for the defendants would have followed necessarily"; in light of decision "the whole purpose of the litigation fails"].) These cases address pure issues of law on undisputed, or materially undisputed, facts. In such a situation consideration of the newly raised point will not necessitate a retrial; rather a final judgment will be entered in favor of one of the parties. Permitting the point to be raised therefore does not implicate the considerations of economy and fairness on which the requirement of predicate objections is based.[8]
Indeed, we have found no case in which a judgment was reversed for a new trial after an appellant failed to raise appropriate objections in the trial court, even where the point rested on newly issued judicial clarifications of previously unsettled law.[9] For such a result to obtain, it would have to appear not simply that new authority would have mandated somewhat different proceedings at trial, but that the *58 balance of fairness and judicial economy weighed distinctly in favor of excusing the appellant from the usual rule.
This is not such a case. Defendant has offered no excuse for not raising the concept of an immunity window prior to the verdict. The enactment and subsequent repeal of tobacco company immunity in section 1714.45 raised delicate issues of statutory construction, but the possible answers to the question took only three shapes: (1) the repeal could have been wholly ineffective to reinstate tobacco company liability, such that tobacco defendants could only be liable for conduct taking place after the statute was repealed; (2) the repeal could have utterly abolished the defense, as though the former immunity had never existed; or (3) the repeal could have been held to have an intermediate effect. The most obvious rule in the third category is the one adopted by the Supreme Court in Myers/Naegele, i.e., that the former statute continued to shield conduct which was undertaken under the protection of the statute, i.e., while the statute was in effect. This outcome gives the 1998 repeal a substantial effect by restoring the application of basic tort law to a great deal of tobacco company conduct. At the same time, it protects the reliance interests which lie at the heart of the judicial aversion to "retroactive" changes in substantive law. The Supreme Court has summarized the governing jurisprudential concern as follows: "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the `principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.'" (Landgraf v. USI Film Products (1994) 511 U.S. 244, 265, 114 S.Ct. 1483, 128 L.Ed.2d 229, italics added, fns. omitted, quoting Kaiser Aluminum & Chemical Corp. v. Bonjorno (1990) 494 U.S. 827, 855, 110 S.Ct. 1570, 108 L.Ed.2d 842 (cone. opn. of Scalia, J.).)
Defendant cannot claim to have been unaware of this concern; it quoted the foregoing passage in its memorandum in support of nonsuit. Similarly it quoted language from a federal district court order holding the repeal of section 1714.45 "not retroactive" in the sense that the tobacco defendants there were "`immune from liability for Plaintiffs tobacco-related personal injuries caused by conduct occurring during the effective period of the 1987 statutory amendment.'" (Italics added, underlining removed.) Yet defendant at no time prior to verdict suggested to the trial court that the net effect of the repealed immunity might be to render certain evidence inadmissible or to place limitations on the purposes for which such evidence could be admitted. Defendant argued only that the former statute continued to afford the same categorical defense it provided before its repeal.[10]
*59 Any doubt about the foreseeability of the Myers/Naegele immunity window is dispelled by defendant's own allusion to this concept immediately after trial. In its new trial memorandum, defendant asserted for the first time that, "[a]t a minimum, the jury should have been instructed that it could not consider Defendant's conduct during the 1988-1997 period in determining Philip Morris' liability and in computing Plaintiffs damages. Since the jury was permitted to impose liability for compensatory and punitive damages on the basis of conduct that was immunized when it occurred, Philip Morris was prevented from having a fair trial."
Of course a motion for new trial is no substitute for timely objections during trial. (See Stevens v. Owens-Corning Fiberglas Corp. (1996) 49 Cal.App.4th 1645, 1653-1654, 57 Cal.Rptr.2d 525 [rejecting claim that "legal challenges may be presented for the first time by way of posttrial motion and will be treated as if raised before the verdict"]; id. at p. 1654, 57 Cal.Rptr.2d 525 [distinguishing Hoffman-Haag v. Transamerica Ins. Co. (1991) 1 Cal.App.4th 10, 1 Cal.Rptr.2d 805, as involving "a question of law on undisputed facts"].) Here the chief relevance of the motion is to show that, five weeks after the jury returned its verdict, defendant was fully cognizant of the possibility of an immunity window. Nothing in the record suggests that this constituted a new realization, let alone that any putative failure to recognize it earlier was excusable.[11]
Even if defendant had not demonstrated its own awareness of a possible immunity window, we would conclude that such a possibility was apparent, if not obvious, from the nature of the issues presented. Indeed in our prior opinion we ourselves twice alluded to that possibilityonce in response to defendant's argument that the repeal of former section 1714.45 should not be given "ex post facto" effect, and once in connection with defendant's argument that "conduct immunized by section 1714.45 should not be considered in support of a punitive damages award."
The rule of Myers/Naegele was not an unforeseeable departure from existing law but one of two or three obvious possibilities in a patently unsettled area. Defendant has not shown that it could not be expected to anticipate this rule or, indeed, that it did not actually anticipate it. Defendant has thus failed to bring itself within the cases permitting a new point to be raised on appeal based on the effect of an intervening change in law.
We also note that few if any cases invoking the exception for points based on new authority rely on that exception alone. Instead, most or all of them present additional grounds for exception, such as that the new point raises pure issues of law on undisputed facts or affects a matter of public interest or policy, or both.[12] Neither *60 of these additional factors is present here. The application of section 1714.45 does not raise a pure question of law on undisputed facts but affects only the admissibility of evidence or the purposes for which it may be considered. If defendant's newly asserted objections were to succeed on appeal, the necessary result would be a retrial of liability or punitive damages, or both. Nor does the question implicate the public interest or public policy. The major issues concerning the application of former section 1714.45 have now been authoritatively resolved by Myers and Naegele. Our consideration of the merits would therefore relate almost solely to the issue of prejudice. (See Bihun v. AT & T Information Systems, Inc., supra, 13 Cal.App.4th 976 at p. 999, 16 Cal.Rptr.2d 787 [point "arguably raise[d] an issue of great public importance," but since intervening authority had decided the point "it is not necessary for this court to address the issue" (italics omitted) ], disapproved on another point in Lakin v. Watkins Associated Industries (1993) 6 Cal.4th 644, 664, 25 Cal.Rptr.2d 109, 863 P.2d 179.)

E. Futility.
Defendant asserts that it would have been futile to argue for an immunity window because the trial court's rulings show that it would have rejected any such argument. This argument takes two slightly different forms. The first variation, which appears primarily in the briefs, is that the trial court's rulings show that it would in fact have rejected the idea of an immunity window if that idea had been presented to it. The second variation, which defendant pressed at oral argument, is that the idea of an immunity window is logically incompatible with the trial court's supposed ruling that section 1714.45 was "not retroactive," such that the trial court could not have given the instruction now sought by defendant without contradicting itself.
Nothing cited by defendant or found by us substantiates the assertion that the trial court would have rejected a proper request for relief based on an immunity window. According to defendant, "the trial court ... held that [in repealing former section 1714.45] the Legislature ... intended to abolish all of Philip Morris' immunity...." (Italics defendant's.) Defendant provides no record citation for this assertion. Elsewhere defendant cites a six-page portion of the proceedings in support of a claim that the trial court held "that the Repeal Statute was retroactive and, therefore, eliminated any right of Philip Morris to assert immunity." (Italics added.) Defendant cites the same six pages for the premise that "[i]n denying the motion [for nonsuit], the trial court found that the Repeal Statute operated retroactively and, therefore, that no aspect of Philip Morris' immunity survived." (Italics in original.)
Nowhere in the cited proceedings did the trial court issue any such categorical ruling, or indeed express any relevant legal opinion. The court's only comment with respect to the motions for nonsuit and directed verdict was, "The court is denying each of the defense motions." Defendant must rely on what it contends was implicit in the trial court's rulings. The only necessary implication of those rulings was the trial court's rejection of defendant's contention that former section 1714.45 afforded it a complete defense so as to require judgment in its favor. That ruling was entirely sound.
The record is similarly devoid of support for defendant's contention that in ruling on defendant's motion for new trial, the trial court necessarily repudiated any idea of an immunity window. It is true, as we have noted, that defendant's *61 memorandum in support of a new trial alluded to such a concept. However the trial court's order denying the motion for new trial discussed former section 1714.45 only as defendant had presented it during trial, i.e., as an assertedly complete bar to liability.[13] Defendant emphasizes that plaintiff did not assert, and the trial court did not find, that defendant had waived the claim of an immunity window. We reject any notion that a point not otherwise preserved becomes cognizable on appeal merely because the opposing party fails to assert waiver in the trial court. The purpose of the rule is to avoid needless retrials and to encourage parties to make their best case when the opportunity is presented to them.[14] An objection which should have been raised prior to the verdict, but was not, is no more worthy of consideration on motion for new trial than it is on appeal. (See Stevens v. Owens-Corning Fiberglas Corp., supra, 49 Cal.App.4th at p. 1655, 57 Cal.Rptr.2d 525.) The trial court was entitled to ignore defendant's belated suggestion of instructional error without explicitly finding a waiver of the point.
At oral argument defendant asserted that the concept of an immunity window conflicts irreconcilably with the trial court's implicit holding that the repeal was "retroactive." This argument assumes that "retroactivity" is a single fixed characteristic which is either present or absent in a particular statute. In fact the term has many meanings and shades of meaning, and whether a particular application of a given statute is "retroactive" may depend on what exact meaning is intended. In Landgraf v. USI Film Products, supra, 511 U.S. at pp. 268, 114 S.Ct. 1483, the court frankly acknowledged that "deciding when a statute operates `retroactively' is not always a simple or mechanical task." Rather, "[t]he conclusion that a particular rule operates `retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity *62 will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity." (Id. at p. 270, 114 S.Ct. 1483, italics added.)
Defendant treats the trial court's rulings as implicitly holding the 1998 repeal "retroactive" in all respects and for all possible purposes. This treatment is unwarranted. Former section 1714.45 was only offered to the trial court as a complete defense, i.e., as though the 1998 repeal had no effect whatever on the application of the former statute. Indeed defendant stated as much, writing in its nonsuit memorandum that "[T]he September [1997] amendment [i.e., repeal] has no bearing on the present action." (Italics added.) Thus the only question before the trial court was whether the repeal of that statute was "retroactive" in the broad sense that it permitted plaintiff to assert some claims that would have been barred under the former statute. The trial court correctly answered that question in the affirmative. In doing so it did not need to decide, and did not purport to decide, whether the repeal might be less than wholly retroactive, such that some claims barred under the former statute remained barred, or limited, after the repeal. Accordingly the court did not decide, in fact or by necessary implication, that no immunity window existed.
Nothing in this record substantiates the claim that it would have been futile to request the instruction defendant now contends was erroneously omitted.

F. Affirmative Misdirection.
Defendant also contends that we may entertain its claim of "instructional error," despite the lack of appropriate objection below, because the trial court "gave instructions that were affirmatively erroneous" when it "instructed the jury to `consider all of the evidence bearing upon every issue.'" (Italics defendant's.) Defendant thus invokes the rule that instructions affirmatively misstating the law may be challenged on appeal even though the complaining party did not object to them in the trial court. (See Lua v. Southern Pacific Transportation Co. (1992) 6 Cal. App.4th 1897, 1904-1905, 9 Cal.Rptr.2d 116; Code Civ. Proa, § 647.)
The cited rule applies only to instructions containing "an incorrect statement of the law, in contrast to a claim that the instruction is too general or incomplete." (U.S. Roofing, Inc. v. Credit Alliance Corp. (1991) 228 Cal.App.3d 1431, 1447, 279 Cal.Rptr. 533; see National Medical Transportation Network v. Deloitte & Touche, supra, 62 Cal.App.4th 412 at p. 428, 72 Cal.Rptr.2d 720.) Here the challenged instruction, which is part of BAJI No. 2.60, told the jury that it "should consider all of the evidence bearing upon every issue, regardless of who produced it." (Italics added.) This is a correct statement of law as far as it goes. It does not tell the jury to give any effect it chooses to evidence that has been stricken or admitted for a limited purposes. It merely tells the jury to consider all evidence "bearing upon" a given issue. The manifest purpose and effect of the instruction is to discourage the jury from arbitrarily disregarding evidence. Here, had defendant sought and obtained an instruction concerning the immunity window, the jury would have understood that evidence of immunized conduct did not "bear[ ] upon" some of plaintiffs claims. At worst the cited instruction was "too general or incomplete" on the point now asserted by defendant.[15]
*63 Furthermore, defendant expressly invited the court to give this instruction. As discussed in greater detail in the following part, defendant joined in a stipulation that, with two exceptions, all of the court's instructions were deemed to have been requested by both parties. Defendant contends that it preserved its objection to the claimed "instructional error" by raising former section 1714.45 in its motions for nonsuit and directed verdict. As we have noted, however, nothing in those motions or otherwise before the court suggested that the jury should be instructed as to an immunity window. If defendant wished to raise such a point, it was required under the stipulation to do so by specific contemporaneous objection. Indeed it made such an objection with respect to a conceptually similar point, i.e., that the court should limit the jury's consideration of plaintiffs conspiracy theory to the period before July 1969, as it did with the failure to warn theory. Defendant has never offered any reason for not making a similar point with respect to the jury's consideration of conduct during the immunity period. It follows that the cited sentence from BAJI No. 2.60 was given at the stipulated request of both parties. Under the doctrine of invited error, a party "cannot complain of an erroneous instruction where he requested the instruction given or one substantially similar to it." (9 Witkin, Cal. Procedure, supra, § 384 at p. 435, italics omitted.) Having requested the instruction now challenged, defendant cannot complain of it.
In sum, the trial court did not err in rejecting defendant's only request for relief under section 1714.45its motions for nonsuit or directed verdict. The argument for error now madethat the court erroneously permitted the jury to hear evidence of immunized conduct without instructing the jury on the limited purposes for which it could consider that evidence was never suggested to the trial court by a request that it should withhold such evidence from the jury or instruct it on such limited purposes. Defendant has offered no excuse for this failure and has pointed to no facts either bringing it within the usual exceptions to the requirement of predicate trial court objections or justifying the creation of a new exception. Accordingly, no cognizable error appears in connection with the application of former section 1714.45 in this case.

II.

Federal Preemption
Defendant contends that many or all of the legal grounds on which the jury was permitted to impose liability were preempted by the Public Health Cigarette Smoking Act of 1969, title 15 United States Code section 1331 et seq. (the 1969 Act). The only specific errors suggested are that (1) the court erroneously permitted the jury to consider evidence made inadmissible by the 1969 Act, and (2) the trial court *64 gave an instruction overstating the extent to which the jury could find liability consistent with federal law.[16]
The suggestion of evidentiary error is too vague for appellate consideration. No particular ground of exclusion is offered. We may infer that defendant relies on the premise that preemption rendered certain evidence irrelevant, but we will not address errors at the very nature of which we are forced to guess. Furthermore defendant makes no attempt to establish that any pertinent objection has been preserved for appeal by timely interjection in the trial court. (See Evid.Code, § 353.) We therefore pass this claim without further consideration.
Defendant waived much of its instructional objection by express consent and invitation. Defendant stipulated in open court that all instructions actually read to the jury were given at the "request and the invitation" of both parties except insofar as objections were embodied or expressed (1) in certain dispositive motions denied just before the stipulation was entered; (2) by express statement immediately after entry of the stipulation; or (3) immediately after the reading of instructions, insofar as any party might assert that the instructions as read did not conform to those called for by the stipulation.
Defendant does not claim to have asserted federal preemption as a ground for any of the motions to which the stipulation referred, and appears not to have done so. This stands to reason since preemption by the 1969 Act furnishes no defense to claims arising before its effective date. As for express objections voiced after the stipulation was entered, defendant lodged exactly one: namely, that the instructions were erroneous insofar as they allowed a verdict for plaintiff based on a theory of conspiracy to conceal after July 1, 1969. Counsel stated that defendant's "only objection" was that the instructions failed "to incorporate the July 1, 1969 limitation as it relates to the conspiracy to conceal claim." (Italics added.)
No party will be heard to complain of an error it invited. (Jentick v. Pacific Gas & Elec. Co. (1941) 18 Cal.2d 117, 121, 114 P.2d 343 ["a party cannot successfully take advantage of error committed by the court at his request."]; see Lynch v. Birdwell (1955) 44 Cal.2d 839, 847, 285 P.2d 919.) Defendant is not relieved of this rule by Code of Civil Procedure section 647, which states that jury instructions are among judicial actions "deemed excepted to" without an express exception. (Code Civ. Proc, § 647.) The statute only means that "an appellant is deemed to have excepted to the instructions he has not requested or agreed to." (Pugh v. See's Candies, Inc. (1988) 203 Cal.App.3d 743, 759, 250 Cal.Rptr. 195, italics added; see Stevens v. Owens-Corning Fiberglas Corp., supra, 49 Cal.App.4th 1645 at pp. 1653-1654, 1655, 57 Cal.Rptr.2d 525; id. at p. 1653, 57 Cal.Rptr .2d 525, quoting Mesecher v. County of San Diego (1992) 9 Cal. App.4th 1677, 1686, 12 Cal.Rptr.2d 279 *65 ["The invited error doctrine applies `with particular force in the area of jury instructions.' "].)
By the express terms of the stipulation, defendant "requested] and invit[ed]" the instruction complained of except insofar as it allowed recovery for conspiracy to conceal after 1969. Defendant cannot enlarge this objection on appeal so as to argue that the jury was improperly permitted to consider other theories in connection with post-1969 events and conduct.
With the issue thus narrowed, we find it unnecessary to decide whether the instruction accurately states the scope of federal preemption because it is impossible to say that the verdict was probably affected by any cognizable error. "To prevail on a claim of instructional error, the appellant must show a reasonable probability of a more favorable result in the absence of the error." (Daum v. Spine-Care Medical Group, Inc. (1997) 52 Cal. App.4th 1285, 1313, 61 Cal.Rptr.2d 260.) In considering whether it "`"seems probable" that the error "prejudicially affected the verdict,"'" a reviewing court "should consider not only the nature of the error ..., but the likelihood of actual prejudice as reflected in the individual trial record, taking into account `(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.'" (Rutherford v. Owens-Illinois, Inc. (1997) 16 Cal.4th 953, 983, 67 Cal.Rptr.2d 16, 941 P.2d 1203, quoting Soule v. General Motors Corp. (1994) 8 Cal.4th 548, 580-581, 34 Cal. Rptr.2d 607, 882 P.2d 298.) The burden is on the complaining party to "demonstrate [that] a miscarriage of justice arose from the erroneous instruction." (Rutheiford, supra, 16 Cal.4th at p. 983, 67 Cal.Rptr.2d 16, 941 P.2d 1203.)
Defendant's showing here falls far short of demonstrating that an instruction barring liability for conspiracy to conceal after 1969 would probably have affected the outcome. The jury found for plaintiff on all eight legal theories embodied in the instructions, i.e., (1) supplying a product that failed to perform as safely as an ordinary consumer would expect it to perform; (2) supplying a product before 1969 while failing to give adequate warning of its dangerousness; (3) simple negligence; (4) breach of express warranty; (5) intentional misrepresentation; (6) fraudulent concealment; (7) fraudulent promise; and (8) negligent misrepresentation. The jury also found that defendant committed conspiracy to defraud by concealment, suppression, or misrepresentation of the health effects of cigarette smoking. Only one of these findings (conspiracy to commit fraudulent concealment) is affected by the alleged error before us, and it is only partially affected; a holding in defendant's favor would only mean the jury could not find for plaintiff on that theory on the basis of post-1969 conduct. On the face of the special verdict alone, it appears unlikely that such a limitation would have had any effect on the ultimate finding of liability.
Defendant argues that the court's error with respect to preemption was prejudicial in that it caused the court to "improperly allow[ ] into evidence a mass of documents and testimony" concerning post-1969 advertising, failures to warn, and concealment of health risks. This is not a showing of "prejudice," but an attempt to charge evidentiary error without laying the necessary foundation. (See Evid. Code, § 353.) Defendant makes no coherent showing that this evidence was not admissible for a proper purpose unrelated to concealment, e.g., to establish scienter in support of a claim for fraud. Fraud is outside the preemptive scope of the 1969 Act. (Cipollone v. Liggett Group, Inc. *66 (1992) 505 U.S. 504, 528, 112 S.Ct. 2608, 120 L.Ed.2d 407 (Cipollone ).)
Defendant's next claim of prejudice is that in argument to the jury, plaintiffs counsel relied heavily on the supposedly preempted theory embodied in the challenged instruction. The passages cited by defendant, however, concern not conspiracy to conceal after 1969, but inadequate package warnings before 1969. In her first allusion to package warnings counsel said, "[W]hen Patricia started smoking at age 15 in 1961, there was nothing on the package. There was no warning." (Italics added.) Counsel went on to argue that given the health risks posed by cigarettes, "you'd expect to see a skull and crossbones on it (indicating). You'd expect to see the word `Poison' on it." Counsel next alluded to package warnings in connection with the first warning mandated in 1965, which counsel denounced as inadequate to deter plaintiff, by this time "a regular smoker [who] needed her cigarettes." Federal law posed no impediment to this argument, and defendant does not suggest otherwise. (Cipollone, supra, 505 U.S. at pp. 519-520, 112 S.Ct. 2608.)
The specific passage cited by defendant echoed the earliest one in its reference to a skull and crossbones, and also followed, if at slightly greater distance, explicit references to plaintiffs original acquisition of the smoking habit. Thus counsel conceded plaintiffs inability to specify a date and advertisement that caused her to begin smoking Marlboros. Instead, counsel said, plaintiff had started smoking Marlboros because of a "`cute guy at school'" who "`looked like the Marlboro Man.'" Counsel then discussed defendant's use of the "Marlboro Man" as a symbol of independence particularly appealing to teenagers. To support this argument counsel read aloud from, apparently, a 1976 Philip Morris memorandum quoting a 1969 source which itself was apparently derived from an earlier source. Counsel argued that defendant exploited the symbolism of the Marlboro Man in order to induce teenagers to start smoking its products: "You don't become the No. 1 cigarette brand because you don't appeal to teenagers. That's the only way that you get starters. Starters equal children. And children do not make informed choices. [¶] And had that [apparently indicating image of skull and crossbones] appeared on the pack, there's a greatly [sic] likelihood that somebody would see that, instead of a red and white color package that looks so nice.... That's the kind of warning that would be paid attention to...."
Given this context we find it curious that defendant characterizes these remarks as having been made "without any distinction as to time." Indeed plaintiffs counsel told the jury, if somewhat elliptically, that it could not predicate liability on a failure to warn after 1969. She went on to argue that the jury should find for plaintiff on a consumer expectations theory because the years preceding 1969 were "the time frame when [plaintiff] was ... becoming hooked." Nothing in counsel's argument provides any basis to think that the jury relied on a theory of post-1969 conspiracy to conceal, or that had it been expressly forbidden to do so it would have found for defendant on any other theorylet alone all of them.

III.

STRICT PRODUCTS LIABILITY

A Post-1969 Defect Under "Consumer Expectations Theory."
Defendant contends that, for a variety of reasons, plaintiff was not entitled to judgment on her theory of strict tort liability for manufacture of a defective *67 product. The jury was instructed by stipulation that this claim was established if, as pertinent to this appeal, plaintiff was injured as the result of a design defect in a product manufactured by defendant. A product is defective, the jury was told, if (1) it "fails to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner"; or (2) its use in a foreseeable manner involves a substantial danger not readily recognized by the ordinary user, the danger was known or knowable at the time of manufacture in light of generally recognized and prevailing scientific and medical knowledge, and the manufacturer "failed to give an adequate warning of that danger before July 1, 1969."
Defendant asserts that the trial court erred by permitting plaintiffs "consumer expectations" claim to go to the jury without restricting it to the time before the effective date of the 1969 Act. We have serious reservations about the soundness of this argument, which sounds in federal preemption, but we need not decide the issue because the point is barred by the parties' stipulation. (See pt. II., above.) Defendant argues that it preserved the point by objecting to the portion of the instructions permitting the jury to find conspiracy to conceal after 1969. We fail to see how. Under the stipulated portions of the instructions the jury was free to return a verdict for plaintiff if it found that the cigarettes smoked by her were at any time more dangerous than the ordinary consumer of cigarettes would expect. The jury obviously made such a finding, which was supported by overwhelming evidence.

B. Failure to Heed Warnings.
Defendant asserts two related arguments to the effect that the presence of package warnings barred recovery on a products liability theory as a matter of law.
First, defendant contends that a product labeled with mandatory warnings "cannot" be found to "fail California's consumer expectations test." Insofar as this argument hints at federal preemption it is not cognizable on appeal for the reasons already stated. We address it solely as a proposition of California tort law. We find no persuasive basis for it in the cases cited by defendant.
In Papike v. Tambrands Inc. (9th Cir. 1997) 107 F.3d 737, cert, denied, the court affirmed a summary judgment for a tampon manufacturer on a claim that its product caused the plaintiff to suffer toxic shock syndrome. Defendant cites the case for its disposition of the plaintiffs consumer expectations claim in two terse sentences: "Tambrands' warnings met the federal requirements and Papike's design defect claim therefore fails the `consumer expectation' test. To rule otherwise would allow the anomalous circumstance that a consumer is entitled to expect a product to perform more safely than its government-mandated warnings indicate." (Id. at p. 743.) We are unpersuaded that these comments conform to California law, at least if taken outside the facts of that case. The warnings there might well have justified summary judgment for the defendant, because they explicitly notified the user of the very danger at issue and there is no suggestion of any countervailing evidence raising a genuine material issue of fact as to the likely expectations of consumers. The court's unilluminated statement that liability would be "anomalous" does not furnish a sufficient ground to take the matter from the jury.
In Macias v. State of California (1995) 10 Cal.4th 844, 42 Cal.Rptr.2d 592, 897 P.2d 530, the court held that insecticide makers had no duty to issue warnings to the public in connection with an emergency insect eradication program, where the *68 state had already issued warnings required by applicable statutes. (Id. at p. 857, 42 Cal.Rptr.2d 592, 897 P.2d 530.) The holding did not rest on some presumption that the mandatory warnings were adequate as a matter of law, but on the injudiciousness of requiring private parties to "interfere with" the state's emergency efforts. (Ibid.)
In Temple v. Velcro USA Inc. (1983) 148 Cal.App.3d 1090, 1094, 196 Cal.Rptr. 531, the court affirmed a summary judgment on the ground that the warning given there was sufficient as a matter of law, as shown by the evidence. Nothing in that decision suggests that a government-mandated warning categorically bars liability for a product otherwise shown to be more dangerous than ordinary consumers expect. Other cases cited by defendant do not purport to apply California law, and are not persuasive on the point at issue. (See Haddix v. Playtex Family Products Corp. (7th Cir.1998) 138 F.3d 681, 686 [tampons came within Illinois rule for "simple products," and were not unreasonably dangerous given specificity of warnings and plaintiffs admission that she read them]; Lescs v. Dow Chemical Co. (W.D.Va.1997) 976 F.Supp. 393, 399 [federal labeling act preempted claim under Virginia law that insecticide was defective under consumer expectations theory].)
Defendant's second argument concerning package warnings is that plaintiffs supposed failure to heed warnings precludes, as a matter of law, a finding that any defect in the product was a proximate cause of her injuries. This argument seems to proceed as follows: (1) Where a product bears government-mandated warnings, they must be presumed sufficient to apprise the user of the steps necessary to avoid injury; (2) where a plaintiff fails to take such steps, his or her conduct is a superseding cause of any injury she suffers; (3) had plaintiff quit smoking in compliance with package warnings, "she almost certainly would not have developed lung cancer from smoking"; therefore (4) any defect in defendant's product was not a proximate cause of plaintiffs injuries.
In support of the first point defendant cites four cases for a proposition they do not remotely support, i.e., that "[u]nder California law, a plaintiffs failure to heed a product warning negates any potential liability because, under such circumstances, the plaintiffs own conduct, not a product defect, is the proximate cause of the plaintiffs injury." In Schwoerer v. Union Oil Co. (1993) 14 Cal.App.4th 103, 110-111, 17 Cal.Rptr .2d 227, the court reversed a summary judgment for a defendant based on its claim that its product warnings were adequate as a matter of law; the court assumed the proposition, conceded by the plaintiff, that "where adequate warnings have been passed along from manufacturer or seller to the ultimate consumer, there can be no liability." (Italics in original.) It cited. Persons v. Salomon North America, Inc. (1990) 217 Cal.App.3d 168, 174, 178, 265 Cal.Rptr. 773, where a jury verdict for a ski binding maker was affirmed over the plaintiffs argument that the defendant breached a duty to warn as a matter of law; the court held that the defendant's duty was discharged by giving appropriate warnings to the ski shop that installed the bindings. Similarly, in Carmichael v. Reitz (1971) 17 Cal.App.3d 958, 989, 991, 95 Cal.Rptr. 381, the court affirmed a jury verdict for a drug manufacturer despite a failure to warn the plaintiff, where adequate warnings were given to her physician.
Defendant apparently cites Oakes v. E.I. Du Pont de Nemours & Co., Inc. (1969) 272 Cal.App.2d 645, 649, 77 Cal.Rptr. 709, for its general discussion of failure to warn as a species of product defect. Aside from *69 the inaptness of this discussion to the question of proximate cause, portions of the decision contradict defendant's position. Most notably, the court said that a product bearing an adequate warning, "`which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.'" (Ibid., quoting Rest.2d Torts, § 402A, com. j, italics added.) Defendant points to only one warning here that ever gave any instruction to be "followed"a statement that "Quitting Smoking Now Greatly Reduces Serious Risks to Your Health." This warning was not adopted until October 12, 1984, and was not required to appear until one year after enactment. (Pub.L. No. 98-474 (Oct. 12, 1984) 98 Stat. 2202.) Plaintiff had then been smoking for some 23 years. We are directed to no evidence concerning the medical probability that quitting in 1985 would have affected the course of her illness. In any event Oakes does not support the point for which it is cited.
Likewise Luque v. McLean (1972) 8 Cal.3d 136, 145, 104 Cal.Rptr. 443, 501 P.2d 1163, is concerned not with proximate cause but with the kind of contributory negligence that will constitute a defense to a product liability claim. "`For such a defense to arise,'" the court wrote, "`the user or consumer must become aware of the defect and danger and still proceed unreasonably to make use of the product.' " (Ibid., italics added; see id. at p. 145, fn. 9, 104 Cal.Rptr. 443, 501 P.2d 1163 [discussing Rest.2d Torts, § 402A, com. n, and other authorities on "`assumption of risk'" in strict liability cases].) Defendant apparently waived any such defenses; the stipulated instructions included none on these subjects. The Luque decision therefore has no bearing on this appeal.

C. Reliance on Expert Testimony.
Defendant also contends that the jury's finding of liability on a consumer expectation theory rests impermissibly on expert testimony. This argument depends upon a misconstruction of Soule v. General Motors Corp., supra, 8 Cal.4th 548 at p. 567, 34 Cal.Rptr .2d 607, 882 P.2d 298, concerning the general impropriety of relying on expert witnesses to establish the expectations of the ordinary consumer. The actual holding is that "where the minimum safety of a product is within the common knowledge of lay jurors, expert witnesses may not be used to demonstrate what an ordinary consumer would or should expect." (Ibid., italics added.) In a footnote, the court confirmed, in the context of "specialized" products, the implied corollary of the above rule: "[I]f the expectations of the product's limited group of ordinary consumers are beyond the lay experience common to all jurors, expert testimony on the limited subject of what the product's actual consumers do expect may be proper." (Id. at pp. 568-569, fn. 4, 34 Cal.Rptr .2d 607, 882 P.2d 298.) This rationale would seem to authorize the admission of expert testimony at least for the purpose of establishing what smokers expected at various times in the past, most particularly during the critical period when plaintiff began to smoke and became "hooked." [17]
*70 Defendant extracts from Soule the proposition that "[b]y using experts, plaintiff disqualified herself as a matter of law from relying on a `consumer expectations' theory...." In other words, by merely proffering expert testimony, plaintiff waived her consumer expectations theory. The proposition is absurd if only because expert witnesses may well be called on issues having nothing to do with consumer expectations. (Soule, supra, 8 Cal.4th at p. 567, 34 Cal.Rptr.2d 607, 882 P.2d 298.) Furthermore, the argument again rests on supposed evidentiary and instructional errors that are not separately stated or sufficiently demonstrated on appeal and are not shown to have been raised below. If defendant's argument was sound, the remedy was to attempt to exclude the expert testimony or withhold the consumer expectations theory from the jurynot to suffer admission of the testimony, stipulate to the jury's consideration of the theory, and then seek reversal on appeal.

D. Inherently Dangerous Product: Comment i and BAJI No. 9.00.6.
Defendant next asserts that plaintiffs product liability claims were barred by the doctrine stated in comment i to section 402A of the Restatement Second of Torts (comment i) and BAJI No. 9.00.6. Two distinct errors seem to be asserted. One is that the claims were barred as a matter of law and thus, by implication, should not have been submitted to the jury at all. The other is that the court committed "instructional error" by refusing a supposed request to give BAJI No. 9.00.6.
The claim of instructional error has been waived. Defendant asserts in its reply brief that it requested the instruction in connection with all of plaintiffs product liability theories. No such request is cited. Instead, at the cited point in the transcript, both counsel agreed with the court's statement "that the defense did request that the court give 9.006 [sic ] on the risk/benefit prong of Barker versus Lull." This was an allusion to a specific theory of product liability asserted by plaintiff. (See Barker v. Lull Engineering Co. (1978) 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443.) In response to that limitation, plaintiff expressly abandoned the Barker theory. As a result, the court did not give BAJI No. 9.00.6. If defendant was in any way surprised by this, it was required under the parties' stipulation to object no later than immediately after the instructions were read. It did not do so.
In the face of this record defendant states that "[f]or reasons not explained on the record, the trial court was willing to give BAJI 9.00.6 had plaintiff proceeded to trial on a risks/benefits design defect theory, but refused to give the instruction on the consumer expectations and failure to warn claims...." The court did not "refuse" to do anything; it omitted an instruction that it apparently believed defendant had only requested conditionally. Its reasons were anything but unexplained: the condition under which defendant requested the instruction had ceased to exist. If the court was mistaken, it was up to defendant to say so, not let the matter pass and then offer it on appeal as grounds for a retrial.
This leaves defendant's argument that the doctrine embodied in comment i and BAJI No. 9.00.6 entitled defendant to judgment as a matter of law. Defendant cites six motions or memoranda raising related points; none raises this specific argument. Nonetheless, this is the kind of argument that, if limited to its potential as a complete bar to liability, we may consider on appeal notwithstanding the failure to raise it below. The problem with defendant's many other arguments of similar nature is that they depend on factual predicates, such as package warnings, that do *71 not pertain to the entire period at issue in this suit. As a result they raise only a partial defense. If comment i actually raised a categorical bar, as defendant now contends, the bar might well extend to the entire period at issue. Defendant's argument fails, however, because to the extent comment i reflects California law, it does not furnish a categorical defense but a question of factor multiple questions of factfor the trier of fact.
Comment i is a gloss on the general rule that "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer ... is subject to liability for physical harm thereby caused...." (Rest.2d Torts, § 402A, subd. (1).) The entire point of comment i is to emphasize and enlarge upon the requirement that the product must be "unreasonably dangerous."[18] This requirement "was added to foreclose the possibility that the manufacturer of a product with inherent possibilities for harm (for example, butter, drugs, whiskey and automobiles) would become `automatically responsible for all the harm that such things do in the world.'" (Cronin v. J.B.E. Olson Corp. (1972) 8 Cal.3d 121, 132, 104 Cal.Rptr. 433, 501 P.2d 1153, quoting Prosser, Strict Liability to the Consumer in California (1966) 18 Hastings L.J. 9, 23.)
In Cronin, supra, 8 Cal.3d at pp. 134-135, 104 Cal.Rptr. 433, 501 P.2d 1153, the court held that the "unreasonably dangerous" requirement is not part of California's law of strict product liability. This holding remains good law. (See Barker v. Lull Engineering Co., supra, 20 Cal.3d 413 at p. 417, 143 Cal.Rptr. 225, 573 P.2d 443; Brown v. Superior Court (1988) 44 Cal.3d 1049, 1057, 245 Cal.Rptr. 412, 751 P.2d 470; American Tobacco v. Superior Court (1989) 208 Cal.App.3d 480, 489, 255 Cal. Rptr. 280 (American Tobacco).) Indeed, except as modified by section 1714.45 (see pt. I., above), it has been legislatively ratified. (§ 1714.45, subd. (d).) Defendant acknowledges this while still asserting that comment i, which serves only to illuminate this inapplicable requirement, states the rule applicable to this case. Defendant cites no California case since Cronin that has applied the comment or endorsed its application. (Cf. Harris v. Belton (1968) 258 Cal.App.2d 595, 608, 65 Cal.Rptr. 808; Oakes v. E.I. Du Pont de Nemours & Co., Inc., supra, 272 Cal.App.2d 645, 648, 77 Cal.Rptr. 709.)
Not only does comment i explicate a rule that is not part of our law, it does not by its terms support the categorical bar to recovery defendant would have us adopt. *72 The comment states that to warrant liability, the product must be "dangerous to an extent beyond that which would be contemplated by the ordinary consumer." (Rest.2d Torts, § 402A, com. i, italics added.) This invites a showing by an injured smoker that while cigarettes may have been generally known or believed to pose hazards, they were in fact far more dangerous than was "contemplated by the ordinary consumer." In arguing otherwise, counsel misrepresents applicable authority. In the reply brief counsel writes, "Under Comment i, it is not necessary that the ordinary consumer know or understand every possible risk associated with smoking, so long as cigarettes are `known to be unsafe.' See American Tobacco, 208 Cal. App.3d at p. 490, 255 Cal.Rptr. 280 (there is `no requirement ... that consumers fully appreciate all the risks involved')." (Italics added.) The quoted passage actually states: "As to the second and third claims, there is no requirement under this statute [former § 1714.45] that consumers fully appreciate all the risks involved in the use or consumption of the products within the purview of this section. In order to be covered by this statute it is sufficient that the ordinary consumer knows the product is `unsafe.'" (American Tobacco, supra, 208 Cal.App.3d at pp. 489-490, fn. 5, 255 Cal.Rptr. 280, original italics omitted, new italics added.) The court then goes on to say that but for the statute, the situation could well be different: "Evidence that the risks are greater than those anticipated, either because the product contains unknown dangerous elements or because it may be used in conjunction with substances that unknowingly increase the risks involved, could possibly be used to support a claim that the product is defective under the standards outlined in Barker v. Lull Engineering Co., supra, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (see Discussion, ante, at fn. 4, p. 489, 255 Cal.Rptr. 280.)" (Ibid., italics added.)
Defendant has failed to demonstrate any entitlement to judgment as a matter of law on the authority of comment i.

E. Generally Recognized Danger: Comment j.
Next defendant contends that it should receive some kind of appellate relief on the authority of comment j to Restatement Second of Torts section 402A, which concerns the effect on a failure-to-warn theory of common knowledge of a product's risks. Defendant does not mention in this context any proceedings in the lower court by which this issue was raised or preserved for appeal. We observe, however, that it was one basis for a motion for judgment notwithstanding the verdict. Even viewing the brief as containing an adequate specification of error, the argument on this point is woefully deficient, as epitomized in the assertion that "[b]ecause plaintiff knew of and accepted the risks of smoking, PM cannot be strictly liable to her." Plaintiff denied that she "knew of and accepted the risks of smoking" as they affected her, and indeed presented evidence that few people outside the research community and the tobacco industry appreciated the risks of smoking at the time she was becoming "hooked." In the absence of a compelling showing to the contrary, we presume the jury accepted this testimony and otherwise made any findings necessary to reject defendant's factual premise. Defendant's one-page argument on appeal does not include a compelling showing.

IV.

FRAUDULENT MISSTATEMENT

A Misstatement.
Defendant contends that plaintiff failed to establish two elements of her claims for *73 fraudulent misstatement and fraudulent promise, i.e., a false representation of fact (or actionable false promise) and actual reliance by plaintiff. As defendant puts it, plaintiff presented "no evidence of a misrepresentation of material fact" and "no evidence of actual reliance or causation."
A claim of "no evidence" is a claim of insufficient evidence to support the challenged findings. One raising such a claim assumes a "daunting burden." (In re Marriage of Higinbotham, supra, 203 Cal.App.3d 322, 328-329, 249 Cal.Rptr. 798.) We must presume that the record contains substantial evidence to support every finding necessary to support the judgment. (In re Marriage of Fink (1979) 25 Cal.3d 877, 887-888, 160 Cal.Rptr. 516, 603 P.2d 881.) To overcome this presumption, the party challenging a finding "must summarize the evidence on that point, favorable and unfavorable, and show how and why it is insufficient. (Trailer Train Co. v. State Bd. of Equalization (1986) 180 Cal.App.3d 565, 587-588, 225 Cal.Rptr. 717.)" (Roemer v. Pappas (1988) 203 Cal. App.3d 201, 208, 249 Cal.Rptr. 743, italics added.) Where a party presents only facts and inferences favorable to his or her position, "the contention that the findings are not supported by substantial evidence may be deemed waived." (Oliver v. Board of Trustees (1986) 181 Cal.App.3d 824, 832, 227 Cal.Rptr. 1.)
Defendant makes no attempt to provide a fair summary of the evidence on which the findings of fraudulent misrepresentation and reliance might (and presumptively do) rest. We recognize that the record is exceptionally large, the scope of proof vast, and the limitations on brief length constraining. Fairness might require relaxation of the foregoing requirement if defendant had made a good faith effort to comply with it by at least identifying the evidence most favorable to the judgment. Defendant, however, has made no attempt to set forth the evidence most supportive of the finding and to "show how and why it is insufficient." (Roemer v. Pappas, supra, 203 Cal.App.3d at p. 208, 249 Cal.Rptr. 743.) Our review of the record satisfies us that there was substantial evidence, which defendant does not cogently dispute for purposes of this appeal, that it engaged in a conscious, deliberate scheme to deceive the public, and individual smokers and potential smokers (many or most of whom it knew to be adolescents), about the health hazards and addictive effects of cigarette smoking. The jury could properly find that commencing no later than 1953 and continuing at least until the time of plaintiffs diagnosis, defendant and other cigarette manufacturers acted both in concert and individually to issue innumerable false denials and assurances concerning the dangers of smoking, deliberately fostering a false impression by the public, or more precisely by smokers and prospective smokers, that assertions of health risk were overblown products of puritanical prejudice, that any real hazards had yet to be shown, and that the industry itself was acting and would act diligently to discover the scientific truth of the matter and promptly disclose its findings, good or bad. The jury could also find that plaintiff heard of these false assurances and denials, if only indirectly, and was falsely led to believe, as defendant intended, that there was a legitimate "controversy" about whether cigarettes actually caused cancer or carried any other serious health risks. As a consequence of that information and the distorted judgment brought about by addiction, she was unaffected by reports of adverse health effects because she was unpersuaded they were true or reliable enough to warrant any action by her.
*74 Defendant contends that many of the statements alleged by plaintiff were matters of opinion and thus not actionable. This argument relies on the general rule that statements of opinion will not support an action for fraud, while ignoring the exception on which the jury was instructed, and which it presumptively found applicable to any statements of opinion: "`[W]hen one of the parties possesses, or assumes to possess, superior knowledge or special information regarding the subject matter of the representation, and the other party is so situated that he may reasonably rely upon such supposed superior knowledge or special information, a representation made by the party possessing or assuming to possess such knowledge or information, though it might be regarded as but the expression of an opinion if made by any other person, is not excused if it be false.'" (Harazim v. Lynam (1968) 267 Cal.App.2d 127, 131, 72 Cal.Rptr. 670 quoting Haserot v. Keller (1924) 67 Cal.App. 659, 670-671, 228 P. 383.) Further, if a statement of opinion "`misrepresents the facts upon which it is based or implies the existence of facts which are nonexistent, it constitutes an actionable misrepresentation.'" (Id. at p. 133, 72 Cal.Rptr. 670, quoting Seeger v. Odell (1941) 18 Cal.2d 409, 414, 115 P.2d 977.) The jury here was entitled to find that insofar as any of defendant's statements constituted opinions, they implied the existence of superior knowledge as well as a state of facts that did not exist.

B. Reliance and Causation.
Defendant contends that even if plaintiff showed an actionable misrepresentation, she failed to show that she actually and reasonably relied on anything defendant said or failed to say. Likewise defendant suggests that plaintiff failed to show the closely related element of causation.
Defendant incorrectly asserts that "[t]here is no evidence that plaintiff ever saw or heard ... any ... statements by [defendant] (or other cigarette manufacturers) relating to the health risks of smoking." Defendant ignores plaintiffs testimony that while she recalled "listening and seeing things that the Surgeon General was saying," she was also aware "that the tobacco companies were saying different." (Italics added.) Thus, she testified, package warnings never "faze[d] me one way or the other. I wasn't going to give the cigarettes up at that point." The jury was entitled to find that by this time, in her addicted state, plaintiff was easy prey for defendant's disinformation campaign and readily clutched at the industry's caricature of objective inquiry.
Contrary to defendant's implicit contention, plaintiff did not have to prove that she heard these matters directly from defendant, or from any of its co-conspirators. It was enough that the statements were, as the jury was entitled to find, issued to the public with the intent that they reach smokers and potential smokers, and that plaintiff, as a member of that class, heard them. As the jury was correctly instructed, "One who makes a misrepresentation or false promise or conceals a material fact is subject to liability if he or she intends that the misrepresentation or false promise or concealment of a material fact will be passed on to another person and influence such person's conduct in the transaction involved." (See Rest.2d Torts, § 533; Geernaert v. Mitchell (1995) 31 Cal.App.4th 601, 605, 37 Cal.Rptr.2d 483 [summarizing principles and noting that "if defendant makes the representation to a particular class of persons, he is deemed to have deceived everyone in that class"]; Mirkin v. Wasserman (1993) 5 Cal.4th 1082, 1098, 23 Cal.Rptr .2d 101, 858 P.2d 568 [confirming principle but noting *75 inapplicability where plaintiff unaware of misrepresentation]; Shapiro v. Sutherland (1998) 64 Cal.App.4th 1534, 1548, 76 Cal. Rptr.2d 101 [citing and following Geernaert ]; Committee on Children's Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 219, 197 Cal.Rptr. 783, 673 P.2d 660 [applying principle to misleading advertising]; cf. Gawara v. United States Brass Corp. (1998) 63 Cal.App.4th 1341, 1351, 1355, 74 Cal.Rptr.2d 663 [indirect reliance not shown by evidence].)
Here the jury was entitled to find that defendant's and its coconspirators' misrepresentations concerning the unsettled state of relevant knowledge, and by implication the unreliability of evidence of a cigarette-cancer link, were made with the intention and expectation that they would circulate among and influence the conduct of all smokers and prospective smokers. They were passed to plaintiff, who knew that while the Surgeon General was saying one thing, the industry was "saying different." This brings her within the cited rule.
Defendant attempts to characterize and then attack plaintiffs fraud theory as "fraud on the market," a concept developed under federal securities law, which the court in Mirkin, supra, 5 Cal.4th 1082, 23 Cal.Rptr.2d 101, 858 P.2d 568, refused to import into our common law of torts. "Fraud on the market" has nothing to do with this case. Its essential principle is that an investor in a security, the price of which has been influenced by fraud, may be deemed to have relied on the fraud. (Id. at p. 1089, 23 Cal.Rptr.2d 101, 858 P.2d 568, citing Basic Inc. v. Levinson (1988) 485 U.S. 224, 241-247, 250,108 S.Ct. 978, 99 L.Ed.2d 194.) Neither that rule nor its context-specific rationale has any bearing on fraud contended to have been practiced on a vast group of consumers, causing many of them to sustain personal injuries. The facts of this case might be more accurately called "fraud on the public," but even that it is misleading. Plaintiff herself was an intended target and victim of the fraud, through precisely the mechanisms of transmission intended by defendant and its coconspirators. Defendant has failed to show any defect in the jury's verdict on the affirmative fraud claims.

V.

BREACH OF EXPRESS WARRANTY
Defendant contends that plaintiff offered "no evidence of an express warranty," such that the judgment in her favor "on this claim" must be reversed. The gist of this argument is that plaintiff showed no express "affirmation of fact," as distinct from an implication, opinion, or general commendation of goods, of which she was personally aware, or on the basis of which she personally acted. Defendant also asserts that there was insufficient evidence to establish that any warranty the jury might have found was actually the basis of any bargain between plaintiff and defendant.
Defendant has failed to meet its burden as a party challenging the sufficiency of the evidence. In a footnote, defendant references plaintiffs simplest evidence of a direct, express warranty from defendant. Plaintiff testified that at some point prior to the late 1980s she began to hear that "low-tar cigarettes were better" and that by smoking them "[y]ou wouldn't get as much tar and nicotine." Accordingly she decided to "`check into this,'" thinking, "`Maybe I'll change from the Reds to the Lights.'" She "did indeed call the Marlboro, Philip Morris company and expressed, you know, my concerns as to, `Is it really true? Is there less tar in this or less nicotine?' [1] And I was assured at the time that if I was concerned that, yes, *76 I could switch to the Lights, which presented a real problem, because approximately a month or two after switching to Lights, I went from two packs of cigarettes to three and a half packs of cigarettes a day."
Defendant fails to "show how and why [this evidence] is insufficient" (Roemer v. Pappas, supra, 203 Cal.App.3d at p. 208, 249 Cal.Rptr. 743) to establish an express warranty. In a footnote it mischaracterizes the testimony as confirming only "that if plaintiff wanted to smoke cigarettes with less tar and nicotine, she could switch to light cigarettes." (Italics added.) We presume the jury did not adopt this interpretation. The least that the testimony reasonably could be understood to mean was that defendant represented to plaintiff that she would take in less tar and nicotine if she switched to Lights. This proved false (the warranty was breached) when (as defendant knew was common) plaintiff simply increased the number of cigarettes she smoked.
Further, even though plaintiffs trial testimony about this conversation was somewhat ambiguous, it supported an inference that defendant's representative expressly assured plaintiff that Lights eliminated or reduced whatever risks smoking might otherwise pose. That is, the assurance as stated at trial was that switching to Lights would address some unspecified "concern[s]." The jury could infer that the "concerns" discussed were related to what plaintiff said motivated the call, i.e., that she had heard "low-tar cigarettes were better." By "better," the jury could infer, plaintiff meant "healthier."
Even if defendant had carried its burden of showing that the record lacks substantial evidence of an express warranty, no prejudice appears. We see no reasonable likelihood that the jury's consideration of this theory had any effect on its findings on other matters, notably the fraud and strict liability claims.

VI.

FRAUDULENT CONCEALMENT
Defendant contends that the jury verdict for plaintiff on the issue of fraudulent concealment cannot be sustained because (1) plaintiff and the public were aware of the health risks of smoking at all relevant times; (2) "plaintiff did not prove" that she relied on any mistaken beliefs that would have been dispelled by the posited disclosures; and (3) any reliance would have been unreasonable as a matter of law.
Again defendant fails to meet its burden as a party challenging the sufficiency of the evidence to support a particular findingin this case the jury's implied finding that neither plaintiff nor the public was aware of, or adequately appreciated, the health risks of smoking. Defendant singles out two favorable passages of deposition testimony and uses them to assert that plaintiff "was aware of the material fact that she claims was not disclosed to herthat smoking cigarettes can damage one's health." In the first plaintiff answered affirmatively the question whether "throughout the time that you smoked, you had heard that there were risks associated with smoking, or you had heard people say things about smoking and health; you just didn't want to believe them." (Italics added.) In the second she acknowledged that there was a warning on every pack she picked up after 1966. Neither of these passages constitutes a binding or compelling admission that when plaintiff began smoking in 1961, or at any particular time thereafter, she knew of, understood, or appreciated the dangers of cigarette smoking. In any event, citing favorable testimony is not enough; defendant must cite the evidence supporting a contrary finding *77 the finding presumptively made by the juryand show "how and why it is insufficient." (Roemer v. Pappas, supra, 203 Cal.App.3d at p. 208, 249 Cal.Rptr. 743.)
Plaintiff testified, among other things, that when she began smoking at age 15 she did not "understand there were dangers about smoking cigarettes." Defendant disregards this particular question and answer, but goes on to assert that plaintiffs trial testimony "is simply not credible." It then singles out testimony in response to the question, "When were you first aware that cigarette smoking could cause lung cancer?" Plaintiffs actual response was, "I think my first complete awareness that cigarette smoking could cause lung cancer was when a doctor came in and told me that I had lung cancer." She testified that she was "baffled" by this information, which she "made them repeat to me several times." She continued: "I just know that I must have seen the warnings, but to be fully aware or believe that this really did cause this, it didn't register in my brain." She was inclined to believe, and preferred to believe, that her lung cancer was the result of asbestos exposure, and she repeatedly questioned doctors about this alternative possibility. So complete was her "denial," as she repeatedly described it, that even after her diagnosis she still sought ways to disbelieve it, in part to keep open the option of taking up smoking again some day. Thus when a friend brought to her attention a report that cigarettes contained ammoniaa substance to which plaintiff had a conditioned aversion based on a childhood trauma plaintiff denounced the report as "`some kind of propaganda against the tobacco company.'"
We see nothing in this testimony that permits us to substitute our own judgments of credibility for those of the jury. Based on this and other evidence, the jury was entitled to find that plaintiff, first because of her youth and inexperience and then because of her addiction, did not believe the package warnings but thought all information about the health risks of smoking was "propaganda" against the tobacco companies.
Nor will we debate the evidentiary minutiae over whether the public adequately appreciated the health risks of smoking to excuse defendant from a duty to disclose. Instead we will presume in support of the judgment that the jury found on substantial evidence that even if there was ample information in the public domain to convince reasonable observers of the hazards of smoking, defendant and its fellows deliberately interfered with the assimilation of that information, particularly by smokers and prospective smokers. It was this class to whom defendant presumably owed a primary duty of disclosure. Nonsmokers were far less directly affected by the issue.
At least one of the cases cited by defendant on this subjectand the only California oneactually supports an argument in favor of the judgment. In Wawanesa Mutual Ins. Co. v. Matlock (1997) 60 Cal. App.4th 583, 587, fn. 3, 70 Cal.Rptr .2d 512, the court noted that tobacco had long had detractors but acknowledged that much of the opposition seemed to rest on concerns of morality or aesthetics, not on any demonstrated health hazard. The court citedand defendant apparently placed in evidence hereKing James I's famous 1604 "Counterblaste to Tobacco," in which he pronounced smoking "[a] custome loathsome to the eye, hatefull to the Nose, harmefull to the brain, daungerous to the Lungs, and in the blacke, stinking fume thereof, neerest resembling the horrible Stigian smoke of the pit that is bottomlesse." By the late nineteenth century, as the Wawanesa court observed, smoking *78 had come to be associated with "general licentiousness" and "cheesy dens of iniquity." (60 Cal.App.4th at p. 587, fn. 3, 70 Cal.Rptr.2d 512.) This provided fertile ground for the tobacco companies' disinformation campaign, since it predisposed addicted smokers (and adolescent presmokers chafing under adult authority) to attribute criticism of smoking to puritanical prejudice rather than sound scientific evidence. It hardly establishes widespread knowledge among smokers or others that, as a matter of scientific and medical fact, smoking poses severe risks to health.
Defendant likewise fails to carry its threshold burden on the subject of actual and reasonable reliance. Defendant states, "plaintiff effectively admitted that any disclosures by PM regarding the health risks of smoking would have been immaterial to her decision." But plaintiff plainly testified that she was unmoved by package warnings only because they failed to indicate how dangerous cigarette smoking was, and because she knew they did not originate from the companies. As plaintiff said, "[T]here's a lot of different degrees of danger. It's dangerous to walk across the street. When you're hooked on something and you have the need to have that, you don'tyou don't listen to that type of warnings. [¶] Maybe if the tobacco company had come out and said: `Our product is dangerous.' [H] But I was listening and seeing things that the Surgeon General was saying that the tobacco companies were saying different." (Italics added.)
Defendant has failed to carry its burden of showing that there was "no evidence," or insufficient evidence, to support each finding necessary to the verdict on the fraudulent concealment theory.

VII.

NEGLIGENCE
We do not address defendant's attack on the jury's finding of simple negligence because the judgment is amply supported by other theories of liability and nothing that occurred in connection with the negligence claim is reasonably likely to have affected the outcome as to those claims.

VIII.

PUNITIVE DAMAGES

A. Sufficiency of Evidence.
Defendant contends that "There Is No `Clear and Convincing' Evidence to Support the Predicate For Punitive Damages." This is another challenge to the sufficiency of the evidence, and once again defendant has failed to carry its burden on appeal.
The jury may award punitive damages "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." (Civ.Code, § 3294, subd. (a).) "`Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Id., subd. (c)(1).) "`Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Id., subd. (c)(2).) "`Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Id., subd. (c)(3).)
We assume that the correct standard for review of a finding of oppression, fraud, or malice is as stated in Hoch v. Allied-Signal, Inc. (1994) 24 Cal. *79 App.4th 48, 60, 29 Cal.Rptr.2d 615, i.e., whether evidence of sufficient substantiality was presented that a reasonable jury "could find [that] the plaintiff ha[d] presented clear and convincing evidence on the disputed issue." (See Tomaselli v. Transamerica Ins. Co., supra, 25 Cal. App.4th at p. 1287, 31 Cal.Rptr.2d 433 ["all we are required to find is substantial evidence to support a determination by clear and convincing evidence"]; cf. Patrick v. Maryland Casualty Co. (1990) 217 Cal. App.3d 1566, 1576, 267 Cal.Rptr. 24 ["clear and convincing evidence" standard guides only trial court and does not affect reviewing court, which continues to apply the substantial evidence standard]; Cloud v. Casey (1999) 76 Cal.App.4th 895, 911, 90 Cal.Rptr.2d 757.) Under this standard, however, defendant still bears the burden of fairly summarizing the evidence favoring the challenged finding and affirmatively demonstrating its insufficiency. (See Roemer v. Pappas, supra, 203 Cal.App.3d at p. 208, 249 Cal.Rptr. 743.) Defendant's presentation fails to fairly characterize the most damaging evidence or address its effect.
Defendant first seeks to categorically exclude two bodies of evidence from consideration in support of the punitive damage award. First, it disingenuously asserts that conduct after July 1, 1969, cannot be considered in light of the federal preemption "with limited exceptions" of claims based on conduct after that time. The primary "limited exception" is that the 1969 Act does not affect state law claims for fraud. (Cipollone, supra, 505 U.S. at p. 528, 112 S.Ct. 2608.) Defendant also asserts that under Myers/Naegele, the jury should not have been permitted to consider conduct immunized by former section 1714.45 in support of a punitive damages award. As we have concluded in part I., above, defendant failed to preserve this argument for appeal. It is therefore unnecessary to decide whether the punitive damage award is likely to have been affected by evidence of conduct during the "immunity window." Defendant's silence with respect to such a theory prevented both the trial court and plaintiff from obviating the objection by one or more steps such as prophylactically withholding or excluding evidence, instructing the jury as to the limited purposes for which such evidence was admitted, or attempting to bring plaintiffs claims within the exceptions to the former immunity noted in Myers/Naegele.
Defendant also attacks the trial court's opinion explaining its denial of defendant's motion to set aside the punitive damages award. The court found the evidence "fully sufficient" to support express or implied jury findings that defendant willfully and consciously marketed its cigarettes to teenagers, violated promises and representations to the public by concealing and suppressing information known to it concerning the addictive and harmful properties of its product, and "affirmatively misled the American public by advertising that there was genuine and legitimate controversy in the scientific community on the subject of smoker health, when in fact there was no such controversy." In responding to these points defendant fails to fairly summarize or address the evidence underlying the judgment.
Defendant asserts that the finding of "targeting of teenagers" rested on the rationale that "Most people who become cigarette smokers begin smoking by age 19, so cigarette companies must target teenagers." This is not a fair characterization of the record or of the trial court's opinion. Defendant attacks various documents cited by the trial court on the ground that they were not shown to have *80 been authored by a corporate officer, director, or managing agent. But even if we accept this premisewhich again, is not demonstrated but simply asserted as a factthe primary relevance of these materials was not to show conduct by their authors but as admissions of corporate conduct and circumstantial evidence of the mental state of corporate officers, directors, and managers.[19] As defendant concedes, the particular document it most vigorously attacks was a draft presentation to defendant's Board of Directors. It was not deprived of all evidentiary force by its "draft" status. A "draft" is defined and understood as "[a] preliminary sketch or rough form of a writing or document, from which the final or fair copy is made." (4 Oxford English Diet. (2d ed.1989) p. 1008.) From the existence of a draft, the existence of a "final fair copy" may be reasonably inferred. And where a draft document is relevant for its central theme (rather than some incidental feature), it may be inferred that the theme survived into any final version.
Defendant offers the notion that marketing its products to "teenagers" does not establish reprehensible conduct because 18 and 19-year olds are "teenagers" who may lawfully purchase and consume cigarettes. The argument is unsound. Moreover none of the documents cited by the trial court limits itself to 18 and 19-year olds. They discuss smoking habits and "market penetration" among children as young as 12 without the slightest acknowledgment of legal niceties such as defendant now asserts. One document reviews the history of Marlboro's success and the business risks posed by a coming decline in the number of teenagers, and includes the statement, "Because of our high share of the market among the youngest smokers, Philip Morris will suffer more than the other companies...." (Italics added.)
Defendant asserts that its attempts to prevent the official classification of nicotine as a "drug" cannot support an award of punitive damages. Defendant directs us to no indication that plaintiff, the trial court, or the jury placed any reliance on such conduct. It is true that plaintiff played a videotaped excerpt from testimony before Congress in which a Philip Morris executive apparently stated that he did not believe nicotine to be addictive. Elsewhere in its brief defendant contends that this evidence was inadmissible. We do not decide the question because we do not think there is any significant possibility that it affected the outcome.
Defendant contends that its failure to disclose that cigarettes are addictive does not support a punitive award because "it is, at bottom, a quibble over definitions." If so, it is a quibble of which the tobacco industry is the chief author and beneficiary. The question is not whether the term "addictive" applies to cigarettes in some narrow medical sense but whether a reasonable effort should have been made to bring home to defendant's mostly teenage "starters" market the extreme difficulty they were likely to encounter in any future attempt to stop smoking. To borrow language used in 1965 congressional hearings, "For many people, the choice to *81 smoke, once it has been made, may as a practical matter be irrevocable." (Cigarette Labeling and Advertising Hearings before Sen. Com. on Commerce on Sen. Nos. 559 and 547, 89th Cong., 1st Sess., at p. 500 (1965).)
We have examined defendant's remaining points concerning the evidence of oppression, fraud, or malice, and find them to be insufficient to carry defendant's burden of showing that the finding on that subject was marred by error.

B. Size of AwardFederal Constitutional Constraints.
In our previous opinion we rejected defendant's intertwined arguments that the award was the product of passion and prejudice and was excessive under state and federal law. We are now called upon to reconsider in light of Campbell, supra, 123 S.Ct. 1513, whether the award exceeded the federal constitutional limits articulated in that case. We have concluded that the present award cannot be sustained consistent with Campbell, but that an award of $9 million is permissible and appropriate on this record.
"The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." (Campbell, supra, 123 S.Ct. at pp. 1519-1520; see BMW of North America, Inc. v. Gore (1996) 517 U.S. 559, 562, 116 S.Ct. 1589, 134 L.Ed.2d 809 (Gore).) This constraint derives from the fundamental unfairness inherent in arbitrary deprivations of life, liberty, or property, and in the imposition of punishment without fair notice. (Campbell, supra, at p. 1520; Gore, supra, at p. 574, 116 S.Ct. 1589 ["[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."].) Because civil punitive damage awards present a significant risk of arbitrary punishment exceeding that of which the defendant had fair notice, the Supreme Court has undertaken to "constitutionalize" the field by adopting a variety of substantive and procedural safeguards against excessive awards. Among the procedural safeguards is the requirement, which we assume applies to the present case, that appellate scrutiny of punitive awards be governed by a "de novo" standard of review. (Campbell, supra, at p. 1520; cf. Cooper Industries, Inc. v. Leatherman Tool Group, Inc. (2001) 532 U.S. 424, 431, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (Cooper Industries).)
In determining the sustainability of a punitive award the constitutional "guideposts" to be considered are (1) the degree of the defendant's culpability, i.e., the reprehensibility of his or her conduct, (2) the ratio between the punitive award and the harm to the victim caused by the defendant's actions, and (3) the sanctions imposed in other cases for comparable misconduct. (Campbell, supra, at p. 1520; Cooper Industries, supra, 532 U.S. 424 at pp. 447-448, 121 S.Ct. 1678, 149 L.Ed.2d 674; see Gore, supra, 517 U.S. at p. 575, 116 S.Ct. 1589.)
The "most important" of the three guideposts is the degree of reprehensibility of the defendant's conduct. (Campbell, supra, 123 S.Ct. at p. 1521.) The record reflects that defendant touted to children what it knew to be a cumulatively toxic substance, while doing everything it could to prevent them and other addicts and prospective addicts from appreciating the true nature and effects of that product. The result of this conduct was that millions of youngsters, including plaintiff, were persuaded to participate in a habit that was *82 likely to, and did, bring many of them to early illness and death. Such conduct supports a substantial award sufficient to reflect the moral opprobrium in which defendant's conduct can and should be held, and warrants something approaching the maximum punishment consistent with constitutional principles.
The Supreme Court has identified several subsidiary factors which pertain to the degree of reprehensibility of a defendant's conduct: (1) whether the defendant inflicted bodily as opposed to merely economic injury; (2) whether its tortious conduct "evinced an indifference to or a reckless disregard of the health or safety of others"; (3) whether "the target of the conduct had financial vulnerability"; (4) whether the conduct "involved repeated actions or was an isolated incident"; and (5) whether the harm was "the result of intentional malice, trickery, or deceit, or mere accident." (Campbell, supra, 123 S.Ct. at 1521.) Each of these factors supports finding a high degree of reprehensibility here. The gist of plaintiffs claim was not that defendant inflicted an economic harm but that its conduct caused her severe bodily injury in the form of lung cancer. Defendant's malicious infliction of such an injury is, in that respect, substantially more reprehensible than the conduct at issue in Campbell (bad faith denial of insurance claim), Gore, supra, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (intentional concealment of repair history in sale of "new" automobile), or Cooper Industries, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (unfair competition, including false advertising, in sale of competing product). Further, defendant's conduct arguably betrayed an attitude characterized not by mere indifference or recklessness, but by a conscious acceptance of the injurious results,
Moreover defendant consciously exploited the known vulnerabilities of children, who by its own words comprised its "traditional area of strength." (See fn. 19, above.) The court in Campbell and Gore stated the third reprehensibility subfactor in terms of financial vulnerability, but that characterization undoubtedly reflects the origins of those opinions in torts of an essentially economic nature. In other cases, such as this one, it makes sense to ask whether and to what extent the defendant took advantage of a known vulnerability on the part of the victim to the conduct triggering the award of punitive damages, or to the resulting harm.[20]
It thus appears that all five of the subfactors in Campbell, supra, 123 S.Ct. 1513, point to a high degree of reprehensibility. However defendant emphasizes the court's criticism of the award there under review for resting in major part on conduct which did not resemble, and had no concrete connection with, the conduct which injured the plaintiffs. Justice Kennedy criticized the punitive claim there for not relying on the insurer's wrongful "conduct toward the Campbells," but for instead having been "used as a platform to expose, and punish, the perceived deficiencies of State Farm's operations throughout the country." (Id. at p. 1521, italics added.) The court went on to identify three categories of conduct which should have been considered with caution, if at all. It first noted that a state "cannot punish a defendant for conduct that may have been lawful *83 where it occurred." (Ibid.; see id. at pp. 1522-1523 [jury should be instructed "that it may not use evidence of out-of-state conduct to punish a defendant for action that was lawful in the jurisdiction where it occurred"].) Such conduct "may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff." (Ibid.) Second, a similar constraint will often apply to unlawful out-of-state conduct, given that a state ordinarily has no legitimate interest in "imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction." (Id. at p. 1522.) And finally, punitive damages cannot permissibly rest on "dissimilar acts" that "b[ear] no relation to the [plaintiffs] harm." (Id, at p. 1523.)
Defendant contends that these limitations render the award here unconstitutional because the jury heard substantial evidence of wrongful conduct outside California, conduct that may have been lawful where (and when) it occurred, and conduct having no causal connection to the harm suffered by plaintiff. Unlike the defendant in Campbell, however, defendant made no attempt to anticipate the Supreme Court's direction by objecting to the evidence or seeking a limiting instruction. (See Campbell, supra, 123 S.Ct. at pp. 1518, 1519.) Defendant also substantially overstates this aspect of Campbell by suggesting that it rendered such evidence categorically inadmissible. On the contrary, the court acknowledged that such evidence may be considered if a sufficient "nexus" is shown to the plaintiffs claim. (Id. at p. 1522; see Gore, supra, at pp. 572-573, 116 S.Ct. 1589, italics added [state "does not have the power ... to punish [a defendant] for conduct that was lawful where it occurred and that had no impact on [the forum state] or its residents"].)
In any event we believe that any error in the consideration of this evidence is sufficiently redressed by the conditional modification we direct here, which reduces the punitive award to a level below which we believe no properly instructed jury was reasonably likely to go. The effect of the evidence affected by these concerns is not nearly as dramatic here as it was in Campbell, supra, 123 S.Ct. 1513. There the plaintiffs' own cause of action rested on a delay in allowing a single insurance claim, and associated conduct; yet the claim for punitive damages rested on a wholesale attack on many aspects of the defendant's nationwide business practices, including even its assertedly malicious treatment of its employees. (Id. at p. 1524.) Plaintiffs claims, in contrast, rest on a quintessential "mass tort," i.e., a course of more-or-less uniform conduct directed at the entire public and maliciously injuring, through a system of interconnected devices, an entire category of persons to which plaintiff squarely belongs.
This brings us to a consideration of the Campbell court's discussion of the second Gore factor, which is the relationship between the actual damages suffered by the plaintiff and the punitive damage award. It is on this point that we believe the present award of $25 million cannot be sustained. Although the Campbell court reiterated its earlier refusals to "impose a bright-line ratio which a punitive damages award cannot exceed" (Campbell, supra, 123 S.Ct. at p. 1524, citing Gore, supra, at p. 582; TXO Production Corp. v. Alliance Resources Corp. (1993) 509 U.S. 443, 458, 113 S.Ct. 2711, 125 L.Ed.2d 366), it went on to suggest several concrete numerical guidelines for considering whether a particular award violates constitutional restraints. Specifically, it stated that (1) *84 "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process"; (2) a "4-to-l ratio" may typically be "close to the line of constitutional impropriety"; (3) higher ratios may be appropriate where "`a particularly egregious act has resulted in only a small amount of economic damages,'" where "`the injury is hard to detect,'" or where "`the monetary value of noneconomic harm might have been difficult to determine' "; (4) lower ratiosperhaps as low as 1 to 1may "reach the outermost limit of the due process guarantee" where "compensatory damages are substantial"; but (5) the "precise award in any case ... must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (123 S.Ct. at p. 1525, quoting Gore at p. 582, 116 S.Ct. 1589.)
The court found the award there, which was 145 times the compensatory damages awarded, constitutionally infirm for a number of reasons: (1) the plaintiffs had been fully compensated by a substantial award of compensatory damages; (2) the harm arose from an economic transaction, "not from some physical assault or trauma," and resulted in no physical injuries; (3) the actual economic damages suffered were "minor" because the defendant insurer had ultimately paid the judgment its conduct caused the plaintiffs to suffer; and (4) the compensatory damages thus probably already included an award for "outrage and humiliation," which was then duplicated in the punitive award. (Campbell, supra, at p. 1525.) The court rejected the Utah Supreme Court's conclusion that the award was justified by other factors, notably the wealth of the defendant and the likelihood, according to expert testimony, that other misconduct by the defendant would go unpunished. (Ibid.) The court rejected the Utah Supreme Court's justification of the award on grounds that, under the third Gore "guidepost," it was proportionate to other sanctions which might have been imposed.[21] (Id. at p. 1526.) The court concluded that the award there "was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of the property of the defendant." (Ibid.) It remanded the matter to the Utah courts for *85 a "proper calculation of punitive damages under the principles we have discussed." (Ibid.)
In light of Campbell we do not believe the 17-to-l ratio reflected in the present judgment can withstand scrutiny. As we read that case, a double-digit ratio will be justified rarely, and perhaps never in a case where the plaintiff has recovered an ample award of compensatory damages. Indeed, where a plaintiff has been fully compensated with a substantial compensatory award, any ratio over 4 to 1 is "close to the line." (Campbell, supra, 123 S.Ct. at p. 1525.) Nonetheless we believe a higher ratio (6 to 1) is justified here by the extraordinarily reprehensible conduct of which plaintiff was a direct victim. There is no reason to believe that the compensatory damages were inflated so as duplicate elements of the punitive award. Moreover, as we have noted, plaintiffs injuries were not merely economic, but physical, and nothing done by defendant mitigated or ameliorated them in any respect.

C. Size of AwardState Law Constraints.
Under California law, a punitive damage award may be reversed as excessive "only if the entire record, viewed most favorably to the judgment, indicates the award was the result of passion and prejudice." (Stevens v. Owens-Corning Fiberglas Corp., supra, 49 Cal.App.4th 1645 at p. 1658, 57 Cal.Rptr .2d 525.) "The purpose of punitive damages is a public oneto punish wrongdoing and deter future misconduct by either the defendant or other potential wrongdoers. The essential question for the jury, the trial court, and the appellate courts is whether the amount of the award substantially serves the public interest in punishment and deterrence. The California Supreme Court has established three criteria for making that determination: (1) the reprehensibility of the defendant's misdeeds; (2) the amount of compensatory damages, though there is no fixed ratio for determining whether punitive damages are reasonable in relation to actual damages; and (3) the defendant's financial condition. [Citations.] The wealthier the wrongdoer, the larger the punitive damage award must be to meet the goals of punishment and deterrence. [Citations.]" (Ibid.)
Defendant correctly notes that the constitutional soundness of the third consideration has been rendered uncertain by Campbell's seemingly categorical rejection of the Utah Supreme Court's reliance on the defendant's "`massive wealth'" as one justification for the award there. (Campbell, supra, 123 S.Ct. at pp. 1525, 1519, quoting Campbell v. State Farm Mut. Auto. Ins. Co. (Utah 2001) 65 P.3d 1134, 1153.) The court declared that "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." (123 S.Ct. at p. 1525.) We need not determine the precise effect of this declaration on California law, however, because in view of our downward reduction of the verdict we do not believe an instruction on this point would have produced a judgment more favorable to defendant.
Defendant also contends that the award is excessive in light of the potential for other actions like this one in which punitive damages may also be awarded, magnifying the deterrent effect. California courts have previously acknowledged the potential multiplicity of awards as a factor that may be weighed, and on proper presentation presumably should or must be weighed, in fixing a punitive damage award. (See Stevens v. Owens-Corning Fiberglas Corp., supra, 49 Cal.App.4th at p. 1661, 57 Cal.Rptr.2d 525; Vossler v. Richards Manufacturing Co. (1983) 143 Cal.App.3d 952, 969, 192 Cal.Rptr. 219, *86 disapproved on other grounds in Adams v. Murakami supra, 54 Cal.3d 105 at pp. 115-116, 284 Cal.Rptr. 318, 813 P.2d 1348; Delos v. Farmers Insurance Group (1979) 93 Cal.App.3d 642, 667, 155 Cal.Rptr. 843; Rest.2d Torts, § 908, com. e; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1328, p. 786.) The implementation of Campbell will presumably diminish the significance of this factor, however, because it will constrain courts and juries to tailor punitive awards more closely to the harm done to individual plaintiffs, substantially reducing the risk that multiple punitive awards will rest on the same facts and conduct so as to constitute multiple punishment.
Again, however, we need not closely consider the issue because we have already weighed the risk of duplicative punishment in further reducing the award. The trial court did likewise, expressly citing the possibility of future awards as one reason to reduce the jury's award from $50 million to $25 million. The court predicted that numerous suits would be filed against defendant, that the costs of defense and any resulting judgments would be substantial, that punitive damages "undoubtedly will be requested and may well be awarded in many such suits," and that this reinforced the court's conclusion "that $25 million is enough to punish and deter in the present context." Defendant has argued that the award should have been reduced even further, and with our remittitur today it has. We also reiterate our earlier observation that the risk of multiple punitive awards against defendant remains highly speculative. The extent to which other plaintiffs may succeed remains to be seen, particularly in light of Myers and Campbell.
Insofar as the award is challenged under California law, we cannot say that, as reduced by the trial court and further reduced by this court, it is the product of passion and prejudice.

DISPOSITION
The judgment is affirmed in part and conditionally reversed in part as follows: The judgment is affirmed with respect to all issues except the amount of punitive damages. As to that issue the judgment is reversed for a new trial unless, within 30 days after our issuance of remittitur, plaintiff files with this court and the superior court a consent to the reduction of punitive damages to $9 million. If plaintiff files such consent, the superior court shall modify the judgment accordingly and the judgment as so modified shall be deemed affirmed.
We concur: KAY, P.J., and REARDON, J.
NOTES
[1] We use the term "addicted" as shorthand without meaning to declare as a judicial fact that tobacco is addictive in any settled medical sense. That question is not before us. The jury here presumptively found that tobacco was addictive in a sense supported by the evidence and supportive of the judgment.
[2] All references to former section 1714.45 are to the version in effect from January 1, 1988, to January 1, 1998.
[3] Following the Supreme Court's example, we use the term "immunity" guardedly to describe the defense conferred by former section 1714.45. (See Naegele, supra, 28 Cal.4th at p. 860, fn. 2, 123 Cal.Rptr.2d 61, 50 P.3d 769.)
[4] Defendant also raised section 1714.45 in its motion for new trial, and there suggested for the first time that the jury should have been told not to consider defendant's conduct during the immunity window in support of most of plaintiff's theories of liability, or in support of a punitive damages award. As we discuss below, this belated assertion of a time-limited immunity was ineffectual to preserve the issue for appeal; it is relevant here only as evidence that defendant was actually aware of such a theory very soon after the jury returned its verdict.
[5] We wrote, "Defendant's claim of erroneous admission of evidence is not cognizable in the absence of an objection below on the ground now asserted. (Evid.Code, § 353, subd (a).) Defendant's statement that the evidence was admitted `despite objection' is somewhat disingenuous: the cited objections had nothing to do with the issue now under discussion. Defendant's complaint that the trial court should have instructed the jury to disregard evidence of conduct supposedly immunized by the statute founders on the acknowledged fact that no such instruction was proffered or requested. Nor does the cited authority (Mock v. Michigan Millers Mutual Ins. Co. (1992) 4 Cal.App.4th 306, 333-334, 5 Cal. Rptr.2d 594) support defendant's claim that the court was required to give such an instruction on its own motion. Finally, in ruling on post-trial motions the trial court was entitled to consider objectionable evidence to which no objection was asserted. (3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 393, p. 484; Cal. Law Rev. Com. com., West's Ann. Evid.Code, § 140.)" (Henley I, typed opn. at p. 7, fn. 4.)
[6] We wrote, "We are directed to no evidence that defendant requested an instruction informing the jury that it could not award punitive damages based on conduct during the time the immunity was in effect (the immunity window). Indeed we are directed to no evidence that defendant ever sought to separate the ex post facto issue, as it arose under section 1714.45, from the claim of a total defense based on that statute. Since the ex post facto argument could at most warrant relief affecting punitive damages, and in that regard only to limit the evidence that the jury could consider, it was not adequately presented by a motion for nonsuit, and is not properly before us." (Henley I, typed opn. at p. 22.)
[7] See Guardianship of Stephen G. (1995) 40 Cal.App.4th 1418, 1422-1423, 47 Cal.Rptr.2d 409, and cases cited ("Courts have often entertained new arguments on appeal when they rest on new authority that the appellant could not fairly be expected to anticipate"; argument entertained because new authority marked "an unforeseeable departure from prior law"); Fisher v. City of Berkeley (1984) 37 Cal.3d 644, 654, fn. 3, 209 Cal.Rptr. 682, 693 P.2d 261 (antitrust challenge to ordinance entertained where, prior to new decision, challenge "could not reasonably have been expected to survive demurrer"); In re Marriage of Higinbotham (1988) 203 Cal. App.3d 322, 334, 249 Cal.Rptr. 798 (new rule of law viewed as example of principle that point is not lost if it "could not have been raised in the court below"); Clemens v. Regents of University of California (1970) 8 Cal. App.3d 1, 20, 87 Cal.Rptr. 108 (reversing for reconsideration of new trial motion in light of intervening authority where new theory "was not open to [appellant] at the time of trial"; appellant should not be "unfairly penalize[d] ... for a lack of extrasensory perception"); cf. Bihun v. AT & T Information Systems, Inc. (1993) 13 Cal.App.4th 976, 999, 1000, 16 Cal.Rptr.2d 787, brackets in original point not entertained where, inter alia, it was not one which, prior to new decision, "`could not reasonably have been expected to [succeed]'"; appellant "could have argued by analogy" from existing authorities; Camsi IV v. Hunter Technology Corp. (1991) 230 Cal. App.3d 1525, 1542, 282 Cal.Rptr. 80 court was "wholly unpersuaded" that prior to rendition of intervening decision, appellant "could not have pursued a nuisance theory".
[8] The Arntz case is also distinguishable because, as noted in a subsequent decision on substantially identical facts, the instruction at issue there purported to enumerate the elements of a tort while leaving out a "material element" as articulated in an intervening Supreme Court decision. (National Medical Transportation Network v. Deloitte & Touche (1998) 62 Cal.App.4th 412, 439, 72 Cal. Rptr.2d 720.) The resulting misdefinition of the tort constituted affirmative misdirection that could be asserted on appeal without an objection in the trial court. (Ibid.) Here there was no misdescription of the elements of any cause of action, and as noted below, no other affirmative misstatement of law. Rather the alleged error consisted of a failure to instruct the jury on a point of evidence.
[9] The nearest thing to a reversal for new trial is found in Clemens v. Regents of University of California, supra, 8 Cal.App.3d at p. 20, 87 Cal.Rptr. 108, where the court essentially delegated the question of disposition to the trial court by remanding for reconsideration of the appellant's motion for new trial. The court declared that such a remedy was available and justified "in the narrow circumstances of this case," because the trial court's ruling was "vitally affected" by intervening authority and either an affirmance or a remand for retrial would have been "grossly unjust to the parties." A similar concern for fairness and judicial economy is reflected in In re Marriage of Higinbotham, supra, 203 Cal.App.3d 322, 249 Cal.Rptr. 798, where this Division reversed a domestic relations order based on intervening changes in law. Justice Poche took pains to narrow the precedential effect of that disposition by noting that the matter was "being remanded in any event" based on another error, and that as a result "consideration of the [newly asserted] point introduces no significant judicial inefficiency." (Id. at p. 335, 249 Cal.Rptr. 798.)
[10] Thus, in its memorandum supporting nonsuit, defendant wrote:

"Immunity under Section 1714.45 does not depend on the peculiar circumstances of each case, but rather is `automatic' and justifies judgment on the pleadings in any claim for product liability against tobacco suppliers. [Citation.]" (Italics added.)
"[B]ecause the statutory immunity ... was in effect at all times relevant to Plaintiff's claims, she is barred from bringing this personal injury action." (Italics added.)
"Section 1714.45 affords Philip Morris virtually absolute immunity for acts committed prior to January 1, 1998." (Italics added.)
[11] At oral argument, counsel for defendant disclaimed any contention that something happened after trial to cause defendant to raise the point.
[12] E.g., Hattersley v. American Nucleonics Corp. (1992) 3 Cal.App.4th 397, 402, 4 Cal. Rptr.2d 331 (point rested on "intervening clarification of the law" and resolution of issue depended on undisputed facts); Fisher v. City of Berkeley, supra, 37 Cal.3d 644 at p. 654, fn. 3, 209 Cal.Rptr. 682, 693 P.2d 261 (pure question of law, undisputed facts, important questions of public policy); Waller v. Truck Ins. Exchange. Inc. (1995) 11 Cal.4th 1, 24, 44 Cal.Rptr.2d 370, 900 P.2d 619 ("question of law based on undisputed facts"); In re Marriage of Higinbotham, supra, 203 Cal. App.3d 322, at p. 335, 249 Cal.Rptr. 798 ("question of law determinable from a factual situation already present in the record"); Moschetta, supra, 25 Cal.App.4th 1218, 1227-1228, 30 Cal.Rptr.2d 893 ("matter of intense public and legal concern").
[13] The court wrote: "Philip Morris urges that California's ten year exemption of tobacco manufacturers from liability, as reflected in former Civil Code § 1714.45, bars most of plaintiff's claims. This Court disagrees. Whereas the exemption was in effect between 1988 and the end of 1997, plaintiff smoked, and became addicted to, Philip Morris' cigarettes in the decades before the exemption went into effect and was first diagnosed with lung cancer after the exemption was lifted. It would be an odd and illogical result, unsupported by the law, if an exemption were to bar an action brought by a person who (a) became addicted to a product as a result of wrongful conduct occurring before the commencement of the exemption, and (b) was diagnosed with disease only after its termination. Moreover, present Civil Code § 1714.45(f) evidences the clear legislative intent to hold tobacco manufacturers accountable in situations such as that presented in the case at bar." (Italics added.)
[14] As the court observed in Marsango v. Automobile Club of So. Cal., supra, 1 Cal.App.3d 688 at p. 695, 82 Cal.Rptr. 92, the opportunity to retry newly raised issues after a reversal on appeal is not enough to secure "fairness to the litigants": "Litigation is an adversary process contemplating an element of risk to all parties. To permit a change of theory on appeal is to allow one party to deal himself a hole card to be disclosed only if he loses. Even if that device does no more than give him a second chance, it has unbalanced the inherent risk of the litigation and put the other party at a disadvantage. Such a process is to be allowed if at all only under unusual circumstancesas for example where the question is purely one of law so that it cannot be said that the balance of litigation risk was altered by the failure to raise it at trial." (See Curcio v. Svanevik (1984) 155 Cal.App.3d 955, 961, 202 Cal.Rptr. 499 [quoting this passage in context of stipulation withdrawing issue from jury].)
[15] To conclude otherwise would cause this boilerplate standard instruction to overturn the rule, codified at Evidence Code section 353, that a party may not complain of the erroneous admission of evidence unless he or she lodges an appropriate objection at trial. Defendant implicitly concedes that it cannot complain of the admission of evidence of immunized conduct since it raised no objection to that evidence when it was introduced and sought no contemporaneous admonition as to the limited purposes for which it could be considered. Defendant's claim of "instructional error" is really a claim that such an admonition should have been given at the conclusion of trial. We question whether a party can sit mute while objectionable evidence is admitted for all purposes and then claim an entitlement to a jury instruction, which amounts in effect to a belated admonition as to limited admissibility. We need not decide the point, however, because defendant neither objected to the evidence when it was admitted nor requested the instruction to which it now asserts an entitlement.
[16] As italicized in defendant's brief, the challenged instruction provided in part: "[B]ecause of federal law, and except only as stated below, you may not base any findings of liability on a determination that (a) defendant Philip Morris, through its advertising or promotional practices, neutralized, minimized or undermined the effect of the federally-mandated warnings after July 1, 1969, or (b) defendant Philip Morris, after July 1, 1969, failed to disclose, or concealed or suppressed, information about the health risks of smoking. [1] The federal law does not limit the potential liability of Philip Morris against claims that it made misrepresentations about the health risks of smoking or that it conspired with other cigarette companies to conceal, suppress, or misrepresent information regarding the health effects of smoking."
[17] We do not consider two related questions, not presented in Soule, concerning the applicability of its holding where (1) the ordinary user of a product may be predisposed by psychological and pharmacological factors associated with its use to perceive its risks differently than do other members of the public, and (2) the "minimum safety" of the product is a matter of public controversy as to which consumers have been exposed to a variety of conflicting opinions, assertions, and sophisticated propaganda techniques intended to neutralize any perception of danger.
[18] Comment i provides: "i. Unreasonably dangerous. The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by `unreasonably dangerous' in this Section. The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fu[ ]el oil, is unreasonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous."
[19] The documents cited by the trial court amply showed knowledge by defendant that its Marlboro cigarettes were particularly successful among children. Another document shows that this was no accident, but the deliberate result of symbols consciously manipulating the adolescent mentality: "Marlboro's traditional area of strength has, of course, been young people because the principal message its imagery delivers is independence. For young people who are always being told what to do, the Marlboro man says, 'I'm in charge of my life. [¶] .... [¶][T]he maturity of the Marlboro man makes him representative of the ideal smokerself confident and secure."
[20] Obviously defendant's conduct was also particularly reprehensible on the fourth and fifth axes, i.e., it "involved repeated actions" rather than "an isolated incident," and it inflicted harm by "intentional malice, trickery, or deceit," rather than "mere accident." (Campbell, supra, 123 S.Ct. at p. 1521.) These factors are present even when we focus on the conduct contributing to plaintiff's own injuries.
[21] The court noted that the existence of criminal penalties was of doubtful significance, particularly where the likelihood of a criminal sanction was remote. (Campbell, supra, at p. 1526.) The "most relevant civil sanction" under Utah law was a fine of $10,000, "an amount dwarfed by the $145 million punitive damages award." (Ibid.) The court rejected "speculation]" about sanctions such as license revocation and disgorgement of profits, noting that "here again [the Utah court's] references were to the broad fraudulent scheme drawn from evidence of out-of-state and dissimilar conduct." (Ibid.)

We place limited reliance on the proportionality factor here, but note that defendant's earlier arguments on this point seemed to backfire. Defendant suggested analogizing its conduct to furnishing tobacco to a minor under California law (Bus. & Prof.Code, § 22958 [civil penalty from $200 for first offense to $6,000 for fifth offense]; Pen.Code, § 308 [penal fine of $200 for first offense up to $1,000 for third offense]) or to violations of the 1969 Act (15 U.S.C. § 1337 [$10,000 per violation]). By our calculations, and in light of the repetitive nature of defendant's conduct, these statutes could support fines in the range of $6.6 million to $11 million, respectively. Assuming plaintiff smoked for three years before reaching the age of 18, and assuming defendant (by its own analogy) furnished cigarettes to her every day of that time, its conduct would seemingly constitute nearly 1,100 violations of the two California statutes cited, and would arguably constitute as many violations of the federal statutes. Assessing the maximum civil penalties of $6,000 and $10,000, respectively, would yield a total state penalty of some $6.6 million and a federal penalty of some $11 million.